**MARYLAND CASUALTY COMPANY,**
Appellant,

v.

**BANK OF CHARLOTTE,** Appellee.

No. 9475.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 25, 1964.

Decided Jan. 5, 1965.

Hunter M. Jones, Charlotte, N. C., (Jones, Hewson & Woolard, Charlotte, N. C., on brief), for appellant.

James D. Monteith, Charlotte, N. C., (Fairley, Hamrick, Hamilton & Monteith, and Francis H. Fairley and S. Dean Hamrick, Charlotte, N. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and SIMONS, District Judge.

SOBELOFF, Chief Judge:

An employee of the Southern Investment Co. of Charlotte, North Carolina, swindled her employer out of approximately $18,000.00 and the Maryland Casualty Co., having issued an employee fidelity bond to Southern, reimbursed its assured for this loss. The Surety then sought, as subrogee of Southern, to recover from the Bank of Charlotte on the theory that the Bank's conduct had made the swindle possible. From a judgment of the District Court denying recovery the Surety appeals.

Jurisdiction is founded upon diversity of citizenship, 28 U.S.C.A. § 1332, and the law of North Carolina is controlling.

In 1955 the Board of Directors of Southern adopted a resolution authorizing any two of its three named officers to engage in certain banking transactions with the defendant Bank. Section 2 of that resolution absolved the Bank from any duty of inquiry that would otherwise arise from the transactions therein described.

In 1958 Southern hired a new corporate secretary, a Miss Ewing. She promptly obtained a blank form like the 1955 resolution and asked Southern's president and principal stockholder whether she should fill it out and substitute her name for that of her predecessor. Permission was granted. Miss Ewing then added her name as one of the three authorized officers, but instead of providing that any two of the three could initiate the specified transactions, she filled in the form to read that any one of the three could do so. She then signed the resolution as Secretary, reciting that it had been adopted by the Board of Directors on the same date in 1955 that the original resolution was passed. This document was then presented by her to the defendant Bank.

On October 1, 1959, Miss Ewing began to sign and submit to Southern's president checks drawn on Southern's accounts in banks other than the defendant Bank but payable to it. Vouchers attached to the checks described their purpose as the transfer of funds or the payment of corporate debts due the defendant. After Southern's president signed these checks and returned them to Miss Ewing, she removed the vouchers. The defendant payee Bank then honored her several oral requests, made from time to time from October, 1959, to June, 1962, to cash the checks, or credit them to her personal account, or apply them to personal loans she had outstanding with that Bank. Nineteen checks totaling $18,-

113.75 were submitted to the Bank in this manner. Of this amount, $5,264.40, in eleven checks beginning with the second in the entire series of 19, was applied by the defendant to personal debts owed it by Miss Ewing.

During the period in which these misappropriations were occurring a Certified Public Accountant made annual reviews of Southern's books and the defendant submitted to Southern monthly statements of its current loan and deposit balances. In January, 1960, Southern's president received an anonymous letter informing him that someone in his organization was using corporate funds to satisfy personal needs. The president held this letter for five months before directing the corporate bookkeeper to investigate. The resulting inquiry, however, revealed no irregularities.

After the discovery of the loss and the reimbursement of Southern by the Maryland Casualty Co., suit was brought by the Surety as subrogee against the defendant to recoup its loss.

The District Court agreed that the Surety was subrogated to any cause of action Southern might have had against the defendant Bank arising out of Miss Ewing's misappropriations but held that no such cause of action existed since Southern had, in section 2 of the resolution above mentioned, absolved the Bank from liability. We must therefore first determine whether there is a liability on the defendant Bank to Southern which could pass by subrogation.

 In 1923 North Carolina adopted the Uniform Fiduciaries Act. The authors of this law undertook to define the potential liabilities of third parties dealing with fiduciaries. 9B U.L.A. 10 (1957). Section 5 of that Act codifies the common law rule that a fiduciary's creditor is liable to the fiduciary's principal if it applies to the personal debt of the fiduciary a check of the principal designating the creditor as payee.[1] The facts clearly show, and the District Judge so found, that this is exactly what happened in this case. Checks amounting to $5,264.40, beginning, as above noted, with the second check in the series, were permitted by the defendant Bank to be used in reducing Miss Ewing's personal debts. The Bank is liable for this amount under the very language of the statute,[2] unless it is determined that the exculpatory resolution was an effective waiver. This question will be considered below.

As to the remainder of the 19 checks, totaling $12,849.35, all of which likewise designated the defendant Bank as payee, it received some for deposit in Miss Ewing's personal account and the others it cashed for her. The Uniform Fiduciaries Act imposes liability on a payee if it "takes the instrument with actual knowledge" of a breach of the fiduciary's obligation or "with knowledge of such facts that his action in taking the in-

1. Under the Uniform Fiduciaries Act a "fiduciary" means an "agent, officer of a corporation * * *." A "person" under the Act is defined to include a corporation. N.C.Gen.Stat. § 32-2 (1950).

"If a check * * * is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. *If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of * * * a personal debt of the fiduciary to the actual knowledge of the creditor * * *, the creditor * * * is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument.*" N.C.Gen. Stat. § 32-6 (1950). (Emphasis added.)

2. See particularly the italicized words, quoted in n. 1 supra.

strument amounts to bad faith." N.C. Gen.Stat. § 32–6 (1950).

A short review of the history of this Act will be of assistance in determining its applicability. At common law a payee was often held liable to the principal if it negligently assisted a fiduciary in misappropriating the principal's funds. Some courts imposed a duty on the payee to investigate the use to which the fiduciary was putting the funds. See Note, 81 U.Pa.L.Rev. 863 (1933). The Uniform Fiduciaries Act did away with the payee's liability for negligence and substituted a new test. For the payee to become liable under this Act it must be found either that it had actual knowledge of the misappropriation or that it acted in bad faith. Colby v. Riggs National Bank, 67 App.D.C. 259, 92 F.2d 183, 114 A.L.R. 1065 (1937). "Actual knowledge" means express factual information that trust funds are being used for private purposes. We think the record shows "actual knowledge," but "actual knowledge" does not exhaust the occasions of liability; another ground is "bad faith." We shall examine the two separately.

In limiting the liability of payees to cases of "actual knowledge" *or* "bad faith" the draftsmen, as we have seen, cited one specific transaction as clearly establishing liability, i.e., acquiescence by the payee in the fiduciary's use of a check, drawn on its principal's account, to pay a debt owing by the fiduciary to the payee. The history of this provision indicates that it was intended to illustrate the general rule of liability rather than to create an exception to it.[3] The crediting of these checks to Miss Ewing's private debts thus constituted either "actual knowledge" or "bad faith." If it is the former, the creditor is liable because from the circumstances it would necessarily have "actual knowledge" that the fiduciary was misappropriating his principal's funds. The Bank, having gained such "actual knowledge" of a breach of a fiduciary obligation when it received the second check in the series and applied it in reduction of Miss Ewing's personal debt, could not divest itself of its continuing knowledge of the faithlessness of the fiduciary. Not only did the alarm bell sound when the Bank received the second check but it kept on sounding for two and one-half years as ten more checks were similarly applied in reduction of her debt. From this would follow that, while the Bank may have acted innocently in cashing the first check, it lost this innocence when the second check was received and used to pay Miss Ewing's personal obligation. It then became liable to Southern for all the later checks in the series, whether the amounts were credited to Miss Ewing's account or paid into her hand.[4]

The Bank's insistence that it never had "actual knowledge" as that term is used in the U.F.A. cannot prevail. It asserts that Miss Ewing's use of the corporate

3. The common law rule prior to the adoption of the U.F.A. was that a creditor taking such a check in payment of a personal debt of the fiduciary was liable to the principal for any amount misappropriated because the face of the check put it on notice that a misappropriation was taking place. See Scott, Participation in a Breach of Trust, 34 Harv.L.Rev. 454 (1921); Johnson-Kettell Co. v. Longley Luncheon Co., 207 Mass. 52, 92 N.E. 1035 (1910). The liability was imposed because the creditor acted with knowledge of facts that were presumed to constitute a misappropriation. This presumption is adopted in the U.F.A., 9B U.L.A. 24 (1957); Note, U.Pa.L.Rev. 863, 866 (1933). In similar cases liability for accepting trust funds in payment of a fiduciary's private debt has been founded sometimes on "actual knowledge," Anacostia Bank v. United States Fidelity & Guaranty Co., 73 App.D.C. 388, 119 F.2d 455, 134 A.L.R. 995 (1941), and at other times on "bad faith." Ward v. City Trust Co., 192 N.Y. 61, 84 N.E. 585 (1908) (applying the N.I.L.).

4. Before the adoption of the U.F.A. the Court of Appeals of New York dealt with a closely similar set of facts. The bank there was held liable for all checks drawn on the principal that it cashed for the fiduciary after the first use of trust funds to reduce the fiduciary's personal obligation. Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N.E. 759, L.R.A.1916F, 1059 (1916).

check designating the Bank as payee to pay her personal debt did no more than put the Bank on notice that something was wrong.[5] It suggests that the possibility always existed, though its improbability is conceded, that the checks were given to Miss Ewing by Southern for her personal use.

Even if we were to accept the Bank's argument that it lacked "actual knowledge," it still would not escape liability, for this would be to overlook the plain language of section 5 of the U.F.A., quoted in footnote 1. That section, after laying down the requirement of "actual knowledge" of a breach or "bad faith," declares liability on the part of a creditor who consciously applies such an instrument to its debtor's benefit. Such conduct is by the statute explicitly made a basis of liability without stopping to categorize it as "actual knowledge" or "bad faith." From this we derive that the statute meant to excuse some lesser default than "actual knowledge" or "bad faith," and that the statutory illustration of liability forcefully implies that such conduct as that in which this Bank engaged constitutes, in the contemplation of the statute, either "actual knowledge" or "bad faith."

The Bank again protests, this time, that it could not have acted in "bad faith" since it did not act dishonestly. It is true that courts construing the U.F.A. have sometimes read "bad faith" to mean "dishonesty." See, e.g., Western Surety Co. v. Farmers & Merchants State Bank, 241 Minn. 381, 63 N.W.2d 377 (1954); National Casualty Co. v. Caswell and Co., 317 Ill.App. 66, 45 N.E.2d 698 (1942). This abbreviated definition is inaccurate if it is read to emphasize and require a high degree of moral guilt. Neither criminal fraud nor downright corruption is an essential ingredient of legal "bad faith." The "bad faith" test was borrowed from the Uniform Negotiable Instruments Act. Paine v. Sheridan Trust & Savings Bank, 342 Ill. 342, 174 N.E. 368 (1931). The standard used in construing the term under that Act has not been evil motive. Instead courts have asked whether it was "commercially" unjustifiable for the payee to disregard and refuse to learn facts readily available. Taylor v. Citizens Bank, 290 Ky. 149, 160 S.W.2d 639 (1942).[6] At some point, obvious circumstances become so cogent that it is "bad faith" to remain passive.

Such was the view of the law when the "dishonesty" definition was first applied under the Uniform Fiduciaries Act. The Pennsylvania Supreme Court posed a hypothetical case where a bank had both reason to suspect a misappropriation by the fiduciary and a monetary interest in the continuance of such activity. It was the court's opinion that such a bank would be acting "dishonestly" if it continued to assist the fiduciary under these circumstances. Union Bank and Trust Co., etc. v. Girard Trust, 307 Pa. 488, 161 A. 865 (1932). Such is precisely the situation presented here, though we find it unnecessary to make the harsh characterization of "dishonesty." The Bank's personnel had before their eyes clear evidence of a probable misappropriation. The Bank was both witness and participant when it began receiving corporate checks and applying them to Miss Ewing's private debt. Thus, from that

5. We note without comment that some courts impose more stringent rules on banks dealing with corporate officers than on banks dealing with fiduciaries of the trustee type. Wagner Trading Co. v. Battery Park National Bank, 228 N.Y. 37, 126 N.E. 347, 9 A.L.R. 340 (1920); Note, 16 Va.L.Rev. 401, 404 (1930).

6. In a case where a bank took a check drawn payable to a corporation in payment of a debt owed by a corporate executive the Court of Appeals held, in interpreting the N.I.L., that:

"Bad faith in taking commercial paper does not necessarily involve furtive motives, for it exists when the purchaser has notice of facts which, if unexplained, would show that he was taking the property of one who * * * owed him nothing, in payment of a claim that he held against some one else." Ward v. City Trust Co., 192 N.Y. 61, 84 N.E. 585, 589 (1908).

date, it had the knowledge requisite for liability. It is noteworthy that, like the bank in the Pennsylvania case, the Bank here had a monetary interest in not notifying Southern since an investigation would jeopardize the flow of repayments on Miss Ewing's personal debt.

Giving the Bank the benefit of the most favorable construction of the statute, we hold that it is not liable for cashing the first check in the series and paying the proceeds, amounting to $2,-100.00, to Miss Ewing. The mere fact that the Bank was designated as payee was not enough to attribute to it either "actual knowledge" or "bad faith." The Bank, however, did act in "bad faith," even if it lacked "actual knowledge," when it received the second check in the series and credited the proceeds to the fiduciary's debt in direct violation of the express statutory provision. This "bad faith" carried over to each of the remaining checks in the series, making it liable for $16,013.75.

▇▇ Southern's resolution, above referred to,[7] did not immunize the Bank from liability. The courts are unanimous in voiding attempts to create exceptions from liability for future willful acts or gross negligence. 6 Williston, Contracts § 1751B (1938). Certainly any agreement protecting a bank from liability for assisting a fiduciary in a misappropriation when the bank acts in "bad faith" or with "actual knowledge" of the fiduciary's breach would come within this rule. The Supreme Court of North Carolina has not decided this exact question but, indicating that it will follow the general rule, has voided comparable agreements. In Pegram v. Western

Union Teleg. Co., 97 N.C. 57, 2 S.E. 256 (1887), it was held, without mentioning its quasi-public status, that a telegraph company cannot contract away its liability for "willful or gross negligence." See Thos. G. Hardie & Co. v. Western Union Telegraph Co., 190 N.C. 45, 128 S.E. 500, 503 (1925). In Bank of Rocky Mt. v. Floyd, 142 N.C. 187, 55 S.E. 95 (1906), it was held that a bank could not contract away its liability for ordinary negligence committed as collecting agent.

It is not necessary to decide, however, whether North Carolina law completely forbids exculpatory contracts, since the Supreme Court of that state has clearly warned all contracting parties that even to the limited extent that exculpatory contracts are permitted they will be strictly construed. Hall v. Sinclair Refining Corp., 242 N.C. 707, 89 S.E.2d 396 (1955); Hill v. Carolina Freight Carriers Corp., 235 N.C. 705, 71 S.E.2d 133 (1952). The present resolution will not withstand such a test. It attempts to protect the Bank from liability arising from checks drawn on the "Corporation's bank account or accounts." It is far from clear that this protection can fairly be read to extend to checks drawn on accounts in banks other than the defendant institution. The defendant's own form, however, goes on to show that the section refers to checks drawn on itself only. The resolution's use of the technical terms "honor" and "presented," terms conceded by both parties to be technically applicable to a drawee bank only, resolves this ambiguity against the Bank's contention that the resolution is meant to apply not only to checks drawn on it, but

7. "(2.) RESOLVED FURTHER, that the authority to sign checks, drafts, and other instruments or orders drawn upon the Corporation's bank account or accounts, and to endorse checks, drafts and other instruments or orders payable to the Corporation, shall not be limited to the above named persons, but shall extend to such persons as are named as being so authorized in any letter or notice signed by any officer of this Corporation * * *, and as to such checks and

drafts the Bank shall not be required to make any inquiry as to the circumstances of the issuance or the disposition of the proceeds of such checks and drafts, but shall honor the same even if drawn payable to bearer or to the individual order of any signing person, or to the Bank or others, whether or not presented to be cashed or for the account of or in payment of such signing person's individual obligation or otherwise."

to checks drawn on any bank. It would be incongruous to speak of "presenting" to it or of its "honoring" checks drawn on other banks. Thus the resolution, even if valid, is by its terms inapplicable, since the checks were all drawn on banks other than the defendant.

Liability is not affected by the contributory negligence sought to be attributed by the Bank to Southern for its failure to discover its employee's misappropriations. The District Court's findings of fact declared Southern non-negligent—probably for the reason, in part at least, that the delay in making the investigation was not a causal factor in the loss. When the investigation was eventually made the irregularities were not discovered, and it is likely that nothing more would have been uncovered by an earlier investigation.

 A determination by us, even if permissible on this record, that the District Court was clearly erroneous in its finding could help the Bank only if liability were predicated on negligence. This is not such a case. Liability here is based on defendant's conscious conduct or "bad faith." Contributory negligence would not negate such fault.

 Having established a right of action in Southern the Surety is entitled to be subrogated to Southern's right against the defendant Bank. In a case applying South Carolina law this court has expressed the general rule:

> "[T]he right of subrogation is an equitable, rather than an absolute, right, applicable only where the equities of the party seeking subrogation are superior to those of the party against whom the right is asserted." Bank of Fort Mill v. Lawyers Title Ins. Corp., 268 F.2d 313 (4th Cir.1959).

The District Court in the present case observed that North Carolina courts dissent from this general rule, saying that in North Carolina an insurance company or surety paying the loss of an assured has an automatic legal right of subrogation against any third party liable to the assured for the loss. The recent case of General Ins. Co. of America v. Faulkner, 259 N.C. 317, 130 S.E.2d 645 (1963), is cited in support of the proposition.

The nature of defendant's liability and the degree of fault attaching to its conduct make it unnecessary to determine which of the two tests in respect to subrogation is operative in North Carolina. Subrogation is available in this case, whichever approach is adopted.

Thus we conclude that the Surety is entitled to recover $16,013.75, representing the sum credited to Miss Ewing's personal debt on December 17, 1959, and all of Southern's funds made available to the fiduciary by the defendant after that date. We agree with the District Court that there is no liability in respect to the first check, for $2,100.00.

Affirmed in part and reversed in part, and remanded for entry of judgment in accordance with this opinion.