**SOUTHERN AGENCY COMPANY, Inc.,**
Appellant,

v.

**HAMPTON BANK OF ST. LOUIS,**
**Respondent.**

**No. 54073.**

Supreme Court of Missouri,
Division No. 1.

March 9, 1970.

As Modified on Court's Own Motion and Motion for Rehearing or to Transfer to Court En Banc Denied April 13, 1970.

Thomas B. Maue, St. Louis, E. J. Mc-Laughlin, Clayton, for plaintiff-appellant.

George E. Lee and Doris J. Banta, St. Louis, for defendant-respondent; Carter, Bull, Baer, Presberg & Lee, St. Louis, of counsel.

DOUGLAS W. GREENE, Special Judge.

This is an action for the conversion of money. The jury returned a verdict for plaintiff in the amount of $41,134.09. The trial judge set aside the jury verdict and rendered judgment for defendant on the following grounds: (1) The evidence did not support a judgment for plaintiff as a matter of law under the provisions of Sections 456.240–456.350, RSMo 1959, V.A.M.S. (Uniform Fiduciaries Act); (2) plaintiff failed to establish a prima facie case; and (3) plaintiff was estopped to recover because of negligence on its part in failing to discover the fraud of the fiduciary.

Considering the evidence in a light most favorable to plaintiff, and giving plaintiff the benefit of all reasonable inferences arising from all the evidence, we find the pertinent facts as follows.

Plaintiff corporation is an insurance company with its bank account in the Mercantile Trust Company. Its president is Sterling G. Phillips. Phillips, Thomas Maue, and Ralph Markus each owned one third of the stock. Markus and Maue were lawyers and were partners. Prior to the incorporation of plaintiff, Phillips owned and operated the Colonial Insurance Agency. Colonial was a corporation. Phillips was its president and owned all its stock except for nominal shares. Colonial had its agency account in defendant's bank. There were no limitations on Phillips's right to draw on that account that were known to defendant bank.

After incorporation of plaintiff, plaintiff and Colonial did business from the same office, where their activities were closely related. They shared employees and office space. The law offices of Markus and Maue were adjoining. It was agreed that Markus and Maue would handle claims and litigation involving plaintiff, and that Phillips would handle the administrative duties and furnish the agency know-how.

Colonial wrote automobile physical damage (collision and comprehensive) insurance, and plaintiff wrote automobile liability insurance.

The corporate bylaws of plaintiff gave Phillips, as president, the power to "in general, supervise and control all of the business and affairs of the corporation." Checks issued by the corporation were to be signed by two of the three stockholders. Phillips had specific authority to procure loans for the corporation and to indorse checks payable to the corporation. His power to indorse was limited by corporate resolution to indorsing for deposit to plaintiff's account in Mercantile Trust or to United Investment Company in payment of loans made by United to plaintiff.

Plaintiff started writing insurance with the Old Republic Insurance Company and switched in 1963 to La Salle Casualty. Colonial had been writing insurance in the Resolute Insurance Company but also transferred its business to La Salle. To avoid confusion, billings were made to brokers in the name of plaintiff, and when the bills were paid the money due Colonial from these accounts was paid to it by plaintiff and the payments were credited to Colonial on its books. Jack Flynn kept the books of both corporations and was paid equally by each.

Plaintiff in late 1962 began to borrow money from the United Investment Company and used its accounts receivable to secure the loans. Plaintiff, from time to time, would execute a note payable to United (this was done by Phillips) and would assign a list of accounts receivable to secure the note. The list was prepared by Flynn. Some of the accounts were due to plaintiff, some to Colonial, and some to a combination of the two. Flynn was aware of this and credited the account receivable to the correct agency. Plaintiff and Colonial each was entitled to some percentage of each loan from United. Under the terms of the loan agreement between plaintiff and United, the loan was made to plaintiff for seventy percent of the pledged accounts, less any balances due on prior notes, and plus financing charges. United would issue its checks made payable in this adjusted amount. As plaintiff or Colonial received checks on the assigned accounts from their brokers, they would be forwarded, usually by Flynn, to United, and United would credit them, after collection, as payments on plaintiff's loan.

The borrowing by plaintiff from United continued from December, 1962, until July, 1965. There were thirty-one notes executed by plaintiff, and thirty-one checks issued by United payable to plaintiff during this period. All of the checks, with exception of the two that are the subject matter of this case, were deposited to plaintiff's account at Mercantile Trust. The two in

question were deposited to the account of Colonial Insurance Agency at defendant bank.

The first check was dated April 28, 1965. It was in the amount of $25,048.51 and was drawn on United's account at the American National Bank, made payable to plaintiff. The check was endorsed by Phillips, "Southern Agency Co., Sterling Phillips, President, Deposit to the account of Colonial Insurors, Clayton, Missouri." It was deposited in Colonial's account by Phillips as a part of a larger deposit of $31,906.95 on April 29, 1965. There was no evidence that Colonial was overdrawn on that date or that any part of the deposit was used to pay any obligation of Phillips to defendant.

A check in the amount of $17,103.51, drawn by Colonial on its account in defendant's bank and payable to Resolute Insurance Company, a company with which Colonial had done business, had been returned to Resolute by defendant on April 24th or 25th as there were not enough funds in Colonial's account to pay the check. After the deposit of April 29th, Phillips purchased, on the same day, with funds from Colonial's account, a cashier's check in the amount of $17,103.51, payable to Resolute Insurance Company. This check was to pay the business obligation owed by Colonial to Resolute as evidenced by the previously returned check.

The second check in question was dated June 1, 1965. It was in the amount of $24,030.58 and was made payable to plaintiff. It was drawn on United's account and was indorsed by Phillips in his capacity as president of plaintiff, and was deposited on June 2, 1965, by Phillips, in Colonial's account in defendant bank, as a part of a deposit of $25,259.87.

Colonial had been overdrawn on June 1, 1965, in the amount of $1,154.92, but had made a deposit of $2,134.51 on the same day that more than covered the overdraft. Colonial was not indebted to defendant on June 2nd, when United's check in the amount of $24,030.58 was deposited to Colonial's account.

On June 2nd Phillips purchased a cashier's check in the amount of $1,500.00 made payable to Old Republic Insurance Company, an agency with which plaintiff, and not Colonial, did business. The purchase was charged to Colonial's account.

On June 7, 1965, Phillips purchased a cashier's check in the amount of $5,000.00, made payable to himself, which was charged to Colonial's account in defendant bank. Phillips, at trial, testified that the $5,000.00 was to purchase stock in the Seddar Investment Company for Markus, Maue, and himself. This testimony was not refuted.

There was no testimony as to why these two checks were deposited to the account of Phillips, other than Phillips's own testimony, which was that the checks represented money owed Colonial by plaintiff, or were due Colonial because of its accounts receivable that had been pledged for the loans.

There was no evidence that defendant bank benefited from the deposit in Colonial's account of the two checks payable to plaintiff, or benefited from the proceeds of any of the three cashier's checks drawn on Colonial's account.

There was no evidence that any specific employee handled any of the transactions in evidence, and no evidence that any specific employee had even a suspicion of wrongdoing on the part of Phillips in indorsing or depositing either of the checks made payable to plaintiff, or in obtaining the three cashier's checks in question.

Only two bank employees testified. Both were witnesses for plaintiff. Mr. Marion Hiles had worked at the Clayton Bank when plaintiff opened its account. Markus or Maue had introduced him to Phillips. He knew that all three had a financial interest in plaintiff company and assumed that they also had an interest in Colonial. He associated the two companies

together. He had no recollection of any limitation being placed on Phillips's authority to indorse, deposit, or cash plaintiff's checks while he was at the Clayton Bank. He was working at defendant bank at the time of the transactions in question but did not handle or authorize any of them. He did not know that Phillips was the sole owner of Colonial.

Orville Curtis was vice president and cashier of defendant bank. He had also been employed at the Clayton Bank at a prior time and knew Hiles then. He had no personal knowledge of any of the transactions in question. He did not know that Colonial had an account in defendant bank. Curtis identified bank records that showed Colonial had been overdrawn on a number of occasions at defendant bank and said that overdrafts must be approved by a bank officer. He and Hiles had the authority to approve overdrafts. It was bank policy not to cash checks made payable to a corporation, but Curtis saw nothing wrong in depositing the check of one corporation to the account of another corporation. No document limiting Phillips' authority to indorse or deposit plaintiff's checks had ever been filed with defendant bank, and no bank employee knew of any such limitation.

Both parties agree that Sections 456.-240–456.350, RSMo 1959, V.A.M.S. (Uniform Fiduciaries Act) are controlling in this case, and that Sterling Phillips, president of plaintiff corporation, was a fiduciary within the definition of Section 456.-240, supra.

Section 456.260, supra, provides in part as follows: "If any negotiable instrument payable * * * to his principal is indorsed by a fiduciary empowered to indorse such instrument on behalf of his principal, the indorsee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary * * * unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to

bad faith. If, however, such instrument is transferred by the fiduciary in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is transferred in any transaction known by the transferee to be for the personal benefit of the fiduciary, the creditor or other transferee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in transferring the instrument."

Section 456.290, supra, provides in part: "If a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith * * *."

Section 456.310, supra, provides in part: "If a fiduciary makes a deposit in a bank to his personal credit * * * of checks payable to his principal and indorsed by him, * * * the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary * * * unless the bank receives the deposit * * * with actual knowledge that the fiduciary is committing a breach of his obligation * * * or with knowledge of such facts that its action in receiving the deposit * * * amounts to bad faith."

Bad faith is not defined in the Act. Good faith is defined as follows in Section 456.240, supra: "A thing is done 'in good faith' within the meaning of Sections 456.240 to 456.350, when it is in fact done honestly, whether it be done negligently or not."

We first consider whether the trial judge, in setting aside plaintiff's verdict and entering judgment for defendant, was

correct in his conclusion that under the evidence plaintiff did not make a prima facie case against defendant and that defendant was entitled to judgment in its favor as a matter of law.

In order to justify a verdict for plaintiff, the evidence must show that defendant, in accepting the two checks of plaintiff indorsed by Phillips for deposit to the account of Colonial, and by allowing Colonial and Phillips to draw on such funds, had actual knowledge of a breach of the fiduciary relationship by Phillips, or had knowledge of such facts that its action in taking the checks in question amounted to bad faith, as that is the liability test prescribed by the statutes in question which govern exclusively.

█ Both parties concede that Phillips, as president of plaintiff, had specific authority to indorse checks payable to Southern Agency Company. It is not necessary, under the Uniform Fiduciaries Act, that the fiduciary have express authority to indorse only for a particular purpose. If he has the power to indorse for any purpose, and if the limitations on that power have not been communicated to the indorsee bank, then actual notice of misappropriation or conduct amounting to bad faith on the part of the bank must be shown in order for the principal to recover, Strong v. City National Bank of Philadelphia, 355 Pa. 390, 50 A.2d 323; Kallison v. Harris Trust & Savings Bank, 338 Ill.App. 33, 86 N.E.2d 858.

We first discuss the question of actual knowledge by defendant of a breach of the fiduciary relationship by Phillips. Under the evidence, the only named employee of defendant who had, at any time, dealings with Phillips, plaintiff, or Colonial, was Hiles. There was nothing in his testimony, or that of any other witness, that showed that Hiles, or any other employee of defendant, actually knew that Phillips, at the time he deposited the two checks of

plaintiff to the account of Colonial or at the time he purchased any of the three cashier's checks in question, was breaching some fiduciary obligation to plaintiff by doing so.

█ "Actual" means real, or existing at the moment, and "knowledge" means the fact or state of knowing. "Know" means to be aware of. Webster's New Word Dictionary, 1963. Actual knowledge, as applied here, therefore means awareness, at that moment, that Phillips was defrauding his principal for his own gain. It means actual knowledge of misappropriation. Colby v. Riggs National Bank, 67 App.D.C. 259, 92 F.2d 183, 114 A.L.R. 1065. It means express factual information that trust funds are being used for private purposes. Maryland Casualty Co. v. Bank of Charlotte, U.S.C.A. 4 Cir., 340 F.2d 550.

█ We hold that there was no actual knowledge by any of defendant's employees, imputable to defendant, that Phillips, in the transactions in question, was breaching any fiduciary duty to plaintiff.

The only other question is whether or not defendant had knowledge of such facts, that the actions of its employees in taking plaintiff's checks for deposit, or by allowing Phillips to draw on said account for his personal gain, amounted to bad faith.

Plaintiff has not cited a case, and we do not find any, which holds under facts such as we have here that a bank is liable to a principal, in a conversion action occasioned by misappropriation by the fiduciary, for failure to inquire as to whether or not the intended deposit to the fiduciary's account or the subsequent withdrawal of funds from the account was for the benefit of the fiduciary in derogation of the rights of the principal, *unless* the bank is benefiting financially from the transaction, as was the case in Maryland Casualty Co. v. Bank of Charlotte, supra. There, the bank was

held liable to the bonding company of the fiduciary, who had to pay to the principal amounts embezzled by the fiduciary from a trust account. The court there held, in a divided opinion, that the bank was liable, for the *second* and subsequent checks written by the fiduciary, where the checks were made payable to the bank and were to pay personal obligations of the fiduciary to the bank. The court reasoned that under such circumstances, the bank had knowledge of such obvious facts that to remain silent would permit the fraud to continue and so failure to inquire amounted to bad faith. The trust account was in defendant bank and was a bona fide trust account with the fiduciary named as trustee. That is not the case here. Here, there is no evidence that any of the three cashier's checks obtained by Phillips with funds from Colonial's account were used to pay any personal obligation of Phillips to defendant. In fact, the plaintiff's own evidence conclusively showed the opposite. There was no evidence that the deposit of plaintiff's two checks by Phillips to the account of Colonial or the procurement of the three cashier's checks was unusual or open to question or suspicion, let alone constituting knowledge of such obvious facts that to remain silent would permit a fraud to continue to the benefit of the bank or the benefit of anyone else.

We have carefully examined the evidence and the record in this case and are convinced that the trial court was correct in setting aside the jury verdict for the plaintiff and entering judgment for defendant, as the record fails to show that defendant bank acted dishonestly or that it received the deposits or issued the cashier's checks in question with actual knowledge that the fiduciary was committing a breach of his obligation, or that the bank had knowledge of such facts that its action in receiving the deposits or issuing the cashier's checks amounted to bad faith.

The conclusion reached makes it unnecessary to discuss other points raised by ap-

pellant. The judgment of the trial court should be affirmed.

It is so ordered.

SEILER, P. J., and HOLMAN, J., concur.

STORCKMAN, J., not sitting.