WILLOWGLEN ACADEMY – WISCONSIN, INC., Willowglen Academy – South Carolina, Inc. and Phoenix Care Systems, Inc., Plaintiffs-Respondents,

v.

CONNELLY INTERIORS, INC., Defendant-Appellant,†

TRANSCONTINENTAL INSURANCE COMPANY and Granite State Insurance Company, Defendants.

Court of Appeals

*No. 2007AP1178. Submitted on briefs November 30, 2007. —Decided January 29, 2008.*

2008 WI App 35

(Also reported in 746 N.W.2d 570.)

† Petition to review filed.

777

778

 

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Edward A. Hannan* of *Hannan & Associates, LLC*, of Brookfield.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Theodore J. Hodan* of *Hodan, Doster & Ganzer, S.C.*, of Milwaukee.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. Connelly Interiors, Inc. (Connelly) appeals from a judgment granting Willowglen Academy-Wisconsin, Inc., Willowglen Academy-South Carolina, Inc., and Phoenix Care Systems, Inc.'s (collectively Willowglen) motion for summary judgment and awarding Willowglen $177,993.60 on its claim for money damages pursuant to the Uniform Fiduciaries Act (U.F.A.), Wis. Stat. § 112.01(6) (2003–04), arising out of Anthony Jansen's (Jansen), Willowglen's former chief financial officer and treasurer, misappropriation of Willowglen funds.[1] In addition, Connelly appeals from the portion of the nonfinal order denying its motion to dismiss Willowglen's U.F.A. claim on grounds that it was time barred by the statute of limitations specified in Wis. Stat. § 403.118(7).[2]

---

[1] The Honorable Jean W. DiMotto presided over the summary judgment proceedings.

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[2] The Honorable Jeffrey A. Kremers presided over the proceedings that resulted in the nonfinal order at issue. Willowglen cross-appealed from the nonfinal order; however, it later voluntarily dismissed its appeal.

¶ 2. Connelly argues that the trial court erred in granting summary judgment to Willowglen because: (1) Connelly lacked actual knowledge of Jansen's fiduciary status; (2) a check is not "drawn" by a fiduciary under Wis. Stat. § 112.01(6) unless the fiduciary personally signs the draft or is identified in the draft as the person who ordered it; (3) Connelly did not have the requisite actual knowledge nor did it act in bad faith in order for liability to ensue under § 112.01(6); and (4) it is a "holder in due course." In addition, Connelly contends that the trial court erred in refusing to apply the statute of limitations period specified in Wis. Stat. § 403.118(7) to bar Willowglen's U.F.A. claim and that the "discovery rule" is inapplicable under the circumstances presented. We conclude: (1) Connelly knew Jansen's fiduciary status; (2) Jansen drew the checks at issue in accordance with § 112.01(6); (3) Connelly had actual knowledge that the funds drawn by Jansen were for Jansen's personal benefit; (4) Connelly is not a "holder in due course"; and (5) as a matter of first impression, the six-year limitations period found in Wis. Stat. § 893.93(1)(a) applies to U.F.A. actions, and, as such, we need not determine the discovery rule's application. Accordingly, we affirm.

## I. BACKGROUND.

¶ 3. On December 8, 2005, Willowglen filed suit asserting claims against Connelly under Wisconsin's Uniform Commercial Code (U.C.C.), Wis. Stat. § 403.306, and the U.F.A., Wis. Stat. § 112.01(6). Only

We are cognizant that another appeal involving Willowglen and the applicable statute of limitations for claims arising under Wis. Stat. § 112.01(6) is currently pending in District II, *Willowglen Academy-Wisconsin, Inc. v. David J. Frank Landscape Contracting, Inc.*, Appeal No. 2007AP2539.

Willowglen's U.F.A. claim is at issue in this appeal. Willowglen contends that Connelly is liable to it for payments Willowglen's fiduciary, Jansen, made using Willowglen payroll account checks to pay for Jansen's personal obligations to Connelly.

¶ 4. Beginning in 2001 and continuing into 2002, Connelly furnished interior decorating services and sold goods to Jansen for Jansen's home. Jansen was the chief financial officer, treasurer, and part owner of Phoenix Care Systems, Inc. (Phoenix) and its subsidiaries, including Willowglen. Jansen made numerous payments to Connelly, two of which were made using checks from Willowglen's payroll account. Of the two checks from Willowglen's payroll account, the first check payable to Connelly was in the amount of $50,000.00, dated November 30, 2001. The second Willowglen payroll account check made payable to Connelly was in the amount of $90,000.00, dated April 26, 2002. Connelly was not an employee of Willowglen. Connelly deposited the checks on December 3, 2001, and April 30, 2002, respectively. Included with the first check was a cover letter from Jansen to James Connelly, the owner of Connelly, which read: "Enclosed please find a check in the amount of $50,000.00 which I would like credited to the outstanding balance Monica [i.e., Jansen's wife] and I owe you." Both checks contained purported authorized facsimile signatures of Willowglen's co-presidents at the time, David Perhach and Leonard Dziubla. According to Dziubla's deposition testimony, the checks were not printed with the authority of the company.[3] Instead, Jansen used a check machine to print the checks, and a

---

[3] On October 24, 2003, a plea agreement was filed in federal court wherein Jansen admitted that he embezzled in excess of $3,000,000.00 from Phoenix Care Systems, Inc. and its subsidiaries through fraudulent financial transactions.

facsimile signature stamp of the co-presidents' names. Jansen's name did not appear anywhere on the checks.

¶ 5. Connelly filed motions to dismiss Willowglen's complaint asserting, in pertinent part, that Willowglen's U.F.A. claim was time-barred by the three-year limitations period specified in WIS. STAT. § 403.118(7). The trial court concluded that the six-year statute of limitations provided by WIS. STAT. § 893.93 applied to Willowglen's U.F.A. claim and denied Connelly's motion to dismiss in that regard.

¶ 6. Willowglen subsequently moved for summary judgment on its U.F.A. claim. In support of its motion, it submitted deposition testimony of James Connelly, who stated, "[m]y understanding was that [Jansen] owned Willowglen. That his father started it, and that he propelled it into a very successful business." This was information James Connelly learned from the expediter working for the contractor building Jansen's home. With respect to the Willowglen payroll checks used by Jansen to pay Connelly, James Connelly testified at his deposition as follows:

> Q So based on that statement then, am I correct that whenever the two [payroll] checks arrived at Connelly Interiors —
>
> A Mm-hmm.
>
> Q — you did not see them? Is that right?
>
> A I did not see them, but Debbie[, Connelly's book-keeper,] asked me about Willowglen because she could not match Willowglen to a client's name. And I said the Jansens own Willowglen. And that was the end of the discussion.
>
> . . . .
>
> Q And that was needed apparently because the check had to match an account?

A Yes.

Q And you didn't have an account with Willowglen Academy. Is that right?

A Yes.

¶ 7. It is undisputed that Connelly was unaware that Jansen was not authorized to issue the two checks submitted from Willowglen's payroll account and that Connelly did not know Jansen's actual position with Willowglen. In addition, it is undisputed that Connelly did not have knowledge of any facts amounting to bad faith. The trial court granted summary judgment to Willowglen and denied Connelly's request for summary judgment pursuant to Wis. Stat. § 802.08(6) (2005–06). Connelly now appeals.

## II. Analysis.

¶ 8. We review a motion for summary judgment *de novo,* using the same methodology as the trial court. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2) (2005–06).

¶ 9. The issue raised in Connelly's appeal regarding the applicable statute of limitations arises from a motion to dismiss. "A motion to dismiss based on a statute of limitations is treated as a motion for summary judgment." *Bartels v. Rural Mut. Ins. Co.,* 2004 WI App 166, ¶ 7, 275 Wis. 2d 730, 687 N.W.2d 84; *see* Wis.

Stat. § 802.06(2)(b) ("If . . . on a motion asserting [a statute of limitations] defense [] . . . matters outside of the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment."). Accordingly, the statute of limitations issue is subject to our independent review. *See Bartels*, 275 Wis. 2d 730, ¶ 7.

*A. U.F.A.*

¶ 10. The provision of the U.F.A. at issue, found at WIS. STAT. § 112.01(6), provides:

> **(6)** CHECK DRAWN BY FIDUCIARY PAYABLE TO THIRD PERSON. If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of a fiduciary's principal by a fiduciary empowered to draw such instrument in the name of his or her principal, the payee is not bound to inquire whether the fiduciary is committing a breach of the fiduciary's obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of the fiduciary's obligation as fiduciary unless the payee takes the instrument with actual knowledge of such breach, or with knowledge of such facts that the payee's action in taking the instrument amounts to bad faith. *If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of the fiduciary's obligation as fiduciary in drawing or delivering the instrument.*

(Emphasis added.) Both parties agree that Connelly's liability under § 112.01(6) hinges on the emphasized language.

784

1. Connelly knew that Jansen was Willowglen's fiduciary.

¶ 11. Connelly asserts that because it did not know Jansen's "actual" position with Willowglen, it did not "actually" know that Jansen was a Willowglen fiduciary. WISCONSIN STAT. § 112.01(1)(b) provides the definition of fiduciary:

> "Fiduciary" includes a trustee under any trust, expressed, implied, resulting, or constructive, personal representative, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, prime contractor or subcontractor who is a trustee under ch. 779, partner, agent, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust, or estate.

The statute further provides: " 'Person' includes a corporation, limited liability company, partnership, or other association or 2 or more persons having a joint or common interest." Sec. 112.01(1)(d).

¶ 12. James Connelly believed Jansen to be the owner of the Willowglen business. At his deposition, James Connelly stated, "[m]y understanding was that [Jansen] owned Willowglen. That his father started it, and that he propelled it into a very successful business." With respect to the Willowglen payroll checks used by Jansen to pay Connelly, James Connelly testified at his deposition as follows:

> Q So based on that statement then, am I correct that whenever the two [payroll] checks arrived at Connelly Interiors —
>
> A Mm-hmm.
>
> Q — you did not see them? Is that right?

785

A I did not see them, but Debbie[, Connelly's book-keeper,] asked me about Willowglen because she could not match Willowglen to a client's name. And I said the Jansens own Willowglen. And that was the end of the discussion.

. . . .

Q And that was needed apparently because the check had to match an account?

A Yes.

Q And you didn't have an account with Willowglen Academy. Is that right?

A Yes.

¶ 13. Jansen was the chief financial officer, treasurer, and part owner of Phoenix and its subsidiaries, one of which was Willowglen. While Connelly may not have known the precise fiduciary arrangement (i.e., Connelly thought Jansen was sole owner when in fact he was part owner), Connelly nevertheless knew that Jansen was a fiduciary of the Willowglen business. Connelly cannot avoid this conclusion simply by asserting that it did not know the exact nature of Jansen's fiduciary status. Wisconsin Stat. § 112.01(6) imposes no such requirement.

2. The checks at issue were "drawn" by Jansen.

¶ 14. Jansen neither personally signed the checks at issue nor was he identified on the checks as the person who ordered them. Instead, the checks contained facsimile signatures of Willowglen's co-presidents. Because Jansen did not personally sign the two checks and was not identified as the person order-

786

ing them, Connelly argues that Jansen did not "draw" them, and therefore, Connelly cannot be held liable under Wis. Stat. § 112.01(6).

¶ 15. Wisconsin Stat. § 112.01(6) pertains to "check[s] . . . drawn by a fiduciary as such, or in the name of a fiduciary's principal by a fiduciary empowered to draw such instrument in the name of his or her principal."[4] Both parties rely on the definition of "drawer" found in Wis. Stat. § 403.103(1)(c), which provides: " 'Drawer' means a person who signs or is identified in a draft as a person ordering payment."

¶ 16. To support its argument, Connelly relies on various statutory sections within Wis. Stat. ch. 403 (namely, the transfer warranties provisions in Wis. Stat. § 403.416; a provision pertaining to transfer of instruments found in Wis. Stat. § 403.203(1); the definition of "demand draft" found in Wis. Stat. § 403.104(11)). Connelly, however, makes no mention of Wis. Stat. § 403.401, which elaborates on the term "signature":

> **(1)** A person is not liable on an instrument unless the person signed the instrument, or the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under s. 403.402.
>
> **(2)** A signature may be made manually or by means of a device or machine and may be made by the use of any name, including a trade or assumed name, or by a word, mark or symbol executed or adopted by a person with present intention to authenticate a writing.

---

[4] The parties agree that the reference to "such instrument" in the second sentence of Wis. Stat. § 112.01(6) relates to "a check . . . drawn by a fiduciary as such, or in the name of a fiduciary's principal by a fiduciary empowered to draw such instrument in the name of his or her principal," found in the first sentence of § 112.01(6).

¶ 17. Based on the foregoing, we disagree with Connelly's analysis of the word "draw," which, in the absence of identification of the person ordering payment, it attempts to equate solely with the act of personally signing the instrument in question. Such an interpretation overlooks the statutory language indicating that a signature can be made in ways other than "manually." *See id.* Here, Jansen drew the checks by using a check machine and the facsimile stamp containing the signatures of Willowglen's co-presidents, which is another way to effectuate a signature.[5] Sec. 403.401(2). Thus, the checks were "drawn by" Jansen, who was Willowglen's "fiduciary," in the name of Jansen's "principal," and the parties do not suggest that Jansen was not "empowered to draw such" checks. Accordingly, under WIS. STAT. § 112.01(6), Jansen was the checks' drawer.

 3. Connelly had actual knowledge that the funds drawn by Jansen were for Jansen's personal benefit.

¶ 18. Connelly argues that it is undisputed that it did not act with the requisite knowledge or bad faith that must be established before liability can arise under WIS. STAT. § 112.01(6). In *Bolger v. Merrill Lynch Ready Assets Trust*, 143 Wis. 2d 766, 773, 423 N.W.2d 173 (Ct. App. 1988), we addressed the knowledge component required before liability will attach under § 112.01(6). We concluded that the statutory language "known by

---

[5] It is unclear how this interpretation trounces the transfer warranties of WIS. STAT. § 403.416, as Connelly contends, given that the statutory section pertaining to signatures, WIS. STAT. § 403.401, is located in the same statutory subchapter.

the payee to be for the personal benefit of the fiduciary," § 112.01(6), requires "actual knowledge or bad faith [as] a precondition for liability."[6] *Bolger*, 143 Wis. 2d at 776–77. It is undisputed that Connelly did not have knowledge of any facts amounting to bad faith. Therefore, we must determine whether, under the undisputed facts, Connelly had actual knowledge that the transactions were for Jansen's personal benefit. We conclude that it did.

¶ 19. " 'Actual knowledge' means express factual information that . . . funds are being used for private purposes." Maryland Cas. Co. v. Bank of Charlotte, 340 F.2d 550, 553 (4th Cir. 1965). The *Bank of Charlotte* court noted:

> In limiting the liability of payees to cases of 'actual knowledge' or 'bad faith' the [U.F.A.] draftsmen . . . cited one specific transaction as clearly establishing liability, i.e., acquiescence by the payee in the fiduciary's use of a check, drawn on its principal's account, to pay a debt owing by the fiduciary to the payee.

*Id.*

---

[6] Willowglen argues that actual knowledge or bad faith is required only to impose liability pursuant to the first sentence in Wis. Stat. § 112.01(6) and that the second sentence, under which both parties agree liability is alleged, does not require bad faith or actual knowledge. This argument overlooks our holding in *Bolger v. Merrill Lynch Ready Assets Trust*, 143 Wis. 2d 766, 771–72, 776–77, 423 N.W.2d 173 (Ct. App. 1988), which incorporates either actual knowledge or bad faith into the second sentence of 112.01(6). We are bound to follow our own precedent as only the supreme court has the power to overrule, modify or withdraw language from a published opinion of the court of appeals. *Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

¶ 20. The transaction detailed in the preceding sentence mirrors what happened here. Connelly acquiesced to Jansen's use of checks drawn on Willowglen's payroll account to pay the debt owed by Jansen to Connelly for the thousands of dollars worth of interior decorating services it performed for Jansen and Jansen's wife. *See id.* Connelly has never argued or pointed to any facts that would lead to the conclusion that its work was somehow for the benefit of Willowglen. Rather, it is wholly undisputed that the work was for Jansen's personal benefit. Connelly was aware that the two checks in question came from Willowglen given its bookkeeper's inquiry as to which account the two checks were to be attributed to because Willowglen did not have an account with Connelly. Consequently, we conclude that Connelly had actual knowledge that the funds drawn by Jansen were for Jansen's personal benefit.

4. Connelly was not a holder in due course.

■

¶ 21. Connelly further contends that as to both checks, it is a holder in due course such that it took the checks free of any "claim of a property or possessory right in the instrument or its proceeds." WIS. STAT. § 403.306. The first requirement that must be satisfied in order for it to qualify as a holder in due course is that "[t]he instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or *is not otherwise so irregular or incomplete as to call into question its authenticity.*" WIS. STAT. § 403.302(1)(a) (emphasis added). In light of our conclusion that Connelly knew Jansen was Willowglen's fiduciary and that it had actual knowledge that the funds drawn by Jansen from Willowglen's account were

for Jansen's personal benefit, it follows that the checks were "irregular," such that they "call[ed] into question [their] authenticity." *Id.* As a result, Connelly's argument as to its holder in due course status fails.

## B. *Statute of Limitations*

¶ 22. No statute of limitations is specified in Wisconsin's U.F.A.; therefore, to determine the limitations period that applies, we must address the interaction between Wisconsin's U.F.A. and U.C.C. provisions. According to Connelly, Willowglen's U.F.A. claim is barred by the three-year limitations period provided in WIS. STAT. § 403.118(7), and the trial court erred when it concluded that the general six-year limitations period of WIS. STAT. § 893.93(1)(a) controlled. We disagree.

¶ 23. A general statute of limitations period is found in WIS. STAT. § 893.93(1)(a), which provides:

> **Miscellaneous actions. (1)** The following actions shall be commenced within 6 years after the cause of action accrues or be barred:
>
> (a) An action upon a liability created by statute when a different limitation is not prescribed by law.

To support its argument that § 893.93(1)(a) applies to these circumstances, Willowglen quotes extensively from *Chouteau Auto Mart, Inc. v. First Bank of* Missouri, 148 S.W.3d 17 (Mo. Ct. App. 2004). Although case law from outside jurisdictions is not controlling, in other cases involving uniform acts, we have deemed it instructive. *See generally State v. McGuire*, 2007 WI App 139, 12, 302 Wis. 2d 688, 735 N.W.2d 555 (analyzing the Wisconsin Uniform Securities Law in relation to case law from other jurisdictions enacting the Uniform

Securities Act and interpreting federal securities legislation); *World Wide Prosthetic Supply, Inc. v. Mikulsky*, 2001 WI App 133, 13 n.5, 246 Wis. 2d 461, 631 N.W.2d 253 (looking to decisions in other jurisdictions regarding the Uniform Trade Secrets Act for guidance); *Doe v. General Motors Acceptance Corp.*, 2001 WI App 199, 9, 247 Wis. 2d 564, 635 N.W.2d 7 (looking to decisions from courts in other jurisdictions to guide U.C.C. analysis).

¶ 24. *Chouteau* involved claims arising after a woman who was both a corporate employee and an officer defrauded the company she worked for by drawing checks on the corporations account, which were payable to First Bank, and subsequently depositing them into her own account. *Id.*, 148 S.W.3d at 19. The company filed suit against First Bank claiming, among other things, a violation of Missouris Uniform Fiduciaries Law (U.F.L.). *Id.* The company argued that its claim against First Bank arose under Missouris U.F.L. provision, which is analogous to Wis. Stat. § 112.01(6). *See Chouteau*, 148 S.W.3d at 21. First Bank disagreed and argued that the companys claim against it arose under the U.C.C. *Id.* at 21–22. The Missouri Court of Appeals concluded that the U.C.C. provisions relied on by First Bank did not set forth the elements of a claim imposing liability and that [the company]s claim against the Bank ha[d] always been and remain[ed] a claim under the U[.]F[.]L. *Id.* at 22. As a result, the *Chouteau* court concluded that because Missouris U.F.L. did not contain a statute of limitations, Missouris general five-year statute of limitations applied to the companys action. *Id.* at 24.

¶ 25. Although *Chouteaus* discussion involved a U.C.C. provision not at issue in this case, its analysis is applicable here where Connelly, like the company in *Chouteau*, is trying to convert Willowglen's action into

792

something that it is not. In *Chouteau*, the court concluded that the company's claim was not founded upon a right given or an obligation imposed by the U.C.C. *Id.* at 24. Consequently, the court held that the statute of limitations provision found in Missouri's statutes on U.C.C. claims applicable to negotiable instruments did not apply. *Id.*

¶ 26. The U.C.C. statute of limitations at issue in *Chouteau* provided as follows:

> (g) Unless governed by other law regarding claims for indemnity or contribution, an action (i) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty, or (iii) to enforce an obligation, duty, or right arising under this Article and not governed by this section must be commenced within three years after the cause of action accrues.

Mo. Rev. Stat. § 400.3–118 (2000); *see Chouteau,* 148 S.W.3d at 23. This is Missouri's analogue to Wis. Stat. § 403.118(7), found in the chapter of Wisconsin statutes on U.C.C. provisions applicable to negotiable instruments. Section 403.118(7) states:

> **(7)** Unless governed by other law regarding claims for indemnity or contribution, an action for conversion of an instrument, for money had and received, or like action based on conversion, an action for breach of warranty or an action to enforce an obligation, duty or right arising under this chapter and not governed by this section shall be commenced within 3 years after the cause of action accrues.

¶ 27. Connelly takes issue with *Chouteau*'s applicability because there, the court focused on Mo. Rev. Stat. § 400.3–118(g)(iii) (i.e., "an action . . . (iii) to enforce an obligation, duty, or right arising under this

Article and not governed by this section must be commenced within three years after the cause of action accrues"), whereas here, Connelly asserts:

> An action to recover proceeds of a negotiable instru-- ment under Wis. Stats. § 112.01(6) is either 'an action for conversion of an instrument . . .'; or, a 'like action based on conversion . . .'; or, an action 'to enforce an obligation, duty or right arising under this chapter . . .' for purposes of Wis. Stats. § 403.118(7).

Because we conclude that Willowglen's U.F.A. claim is separate and distinct from "an action for conversion" or a "like action based on conversion," and because Willowglen's U.F.A. claim, like the claim at issue in *Chouteau*, does not arise under the U.C.C., we disagree with Connelly.[7]

¶ 28. The U.C.C. claim that Willowglen originally alleged in its complaint was previously dismissed based on the limitations period of Wis. Stat. § 403.118(7), leaving only Willowglen's U.F.A. claim to continue. We agree with Willowglen that "a lawsuit attempting to enforce a claim pursuant to the Uniform Fiduciaries Act is not a lawsuit to 'enforce an obligation, duty or

---

[7] To further support its argument that rights and obligations arising under the U.F.A. are rights and obligations arising under the U.C.C., Connelly relies on comments to U.C.C. § 3–307 (Wis. Stat. § 403.307 is modeled after this U.C.C. provision), which indicate that various subsections within § 3–307 follow or are based on sections of the U.F.A. The U.F.A. sections referenced in the comments to § 3–307 do not include the U.F.A. provision at issue here (i.e., U.F.A. § 5, after which Wis. Stat. § 112.01(6) is modeled). Consequently, we conclude that this argument falls short of establishing that Willowglen's U.F.A. claim pursuant to § 112.01(6) is controlled by the three-year statute of limitations. Connelly does not provide any additional legal authority suggesting otherwise.

right arising under' the Uniform Commercial Code," and that it is likewise not a claim for conversion, which constitutes a separate and distinct cause of action.

¶ 29. The distinction between a conversion claim and a U.F.A. claim is apparent after reviewing the jury instruction on conversion, WIS JI—CIVIL 2200. It states:

> A conversion is committed by a person who without consent of the owner (controls) (takes) property of another in such a way that it seriously interferes with the right of the owner to control the property permanently or for an indefinite period of time. Before you may find that (defendant) committed a conversion of property belonging to (owner), you must find the following:
>
> 1. That (defendant) intentionally (controlled) (took) property belonging to (owner);
>
> 2. That (defendant) (controlled) (took) the property without the consent of (owner) or without lawful authority; and
>
> 3. That (defendant)'s act with respect to the property seriously interfered with the right of (owner) to possess the property.
>
> Wrongful or unlawful intent is not an element of conversion. Thus, it is not necessary that (defendant) knew that (owner) was entitled to possession of the property or that (defendant) intended to interfere with (owner)'s possession. It is simply enough that (defendant) intended to deal with the property in a way that would seriously interfere with (owner)'s possession. Thus, a person may be liable for conversion where the person has exercised control over property even though he or she may be unaware of the existence of the rights with which he or she interferes.

WIS JI—CIVIL 2200. These elements differ from those

needed to establish liability under WIS. STAT. § 112.01(6). When the statute is broken down, the § 112.01(6) elements at issue here are as follows:

1. That such instrument (i.e., check or other bill of exchange drawn by fiduciary as such, or in the name of a fiduciary's principal by a fiduciary empowered to draw such instrument in the name of his or her principal) is payable to a personal creditor of the fiduciary;

2. delivered to the creditor in payment of or as security for a personal debt of the fiduciary;

3. to the actual knowledge of the creditor, or

4. that such instrument (i.e., check or other bill of exchange drawn by fiduciary as such, or in the name of a fiduciary's principal by a fiduciary empowered to draw such instrument in the name of his or her principal) is drawn and delivered in any transaction;

5. known by the payee to be for the personal benefit of the fiduciary;

6. if the fiduciary commits a breach of the fiduciary's obligation as fiduciary in drawing or delivering the instrument.

*See id.*

¶ 30. We are not persuaded that a claim arising under WIS. STAT. § 112.01(6) morphs into a common law claim for conversion or a like action. A person or entity can be liable for conversion without being liable for a violation of the U.F.A. and vice versa. The two causes of action are not one and the same, and Connelly provides no legal authority to support its proposition that "[a] claim under WIS. STATS. § 112.01(6) to recover the proceeds of an embezzled negotiable instrument is, in

the end, *an action for conversion of an instrument, for money had and received, or like action based on conversion.*" (Emphasis in brief.)

¶ 31. Furthermore, in the absence of any express statutory language, we are not convinced that claims arising under the U.F.A. and the U.C.C. are connected such that the U.C.C. statute of limitations applies to both causes of action. No mention is made regarding the applicability of the U.C.C. statute of limitations in the U.F.A. The legislature could have specified that Wis. Stat. § 403.118(7) applies to actions for breach of the U.F.A., but the statute does not so provide and we decline to read such terms into its language. *See Meyer v. Meyer*, 2000 WI 132, ¶ 29, 239 Wis. 2d 731, 620 N.W.2d 382 (repeating the oft-stated refusal of courts to read language into the plain language of a statute).

¶ 32. Because we conclude that the six-year limitations period controls this action, we need not address Connelly's argument regarding the inapplicability of the discovery rule as that argument is only pertinent if we had concluded that the three-year limitations period applies. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to decide non-dispositive issues).

¶ 33. For the foregoing reasons, we affirm the trial court's grant of summary judgment in favor of Willowglen and its decision that the six-year limitations period of Wis. Stat. § 893.93(1)(a) controls this action.

*By the Court.*—Judgment and order affirmed.