**W.A. BARI, et al., Plaintiff/Respondent,**

v.

**LINDELL TRUST COMPANY,**
**Defendant/Appellant.**

**No. ED 74304.**

Missouri Court of Appeals,
Eastern District.
Division One.

May 11, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 15, 1999.

Application for Transfer Denied
Aug. 24, 1999.

---

1. Patricia's motion to dismiss Robert's appeal, which was taken with the case, is denied.

Lewis, Rice & Fingersh, L.C., Richard A. Wunderlich, Duane L. Coleman, St. Louis, for appellant.

Andrea L. Weiss, St. Louis, for respondent.

PUDLOWSKI, Presiding Judge.

Lindell Bank and Trust Company (Appellant) appeals the jury verdict and subsequent trial court judgment awarding W.A. Bari, et al. (collectively "Respondents") $85,328.08 on a claim under the Uniform Fiduciaries Law (UFL). Appellant alleges, *inter alia,* that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because Appellant, as a matter of law, could not have violated the UFL in that Mohammad Uppal (Uppal) did not make a deposit "to the credit of a fiduciary as such" as required by Section 456.290 RSMo (1994).[1] The judgment is reversed.

In the summer of 1989, Uppal approached a fellow member of the Muslim community, Dr. Shabbir Haider Safdar (Dr. Safdar), about purchasing a meat packing plant. Uppal wanted to sell specially blessed meats to other Muslims, and asked Dr. Safdar for financial assistance to purchase a plant. At that time, Uppal owned and operated a grocery store where he sold meat prepared in accordance with the Islamic faith. Uppal learned that Ralph Paige (Paige) was interested in selling Paige Packing Company, a meat packing company in St. Louis. Paige and William Foster (Foster) owned and operated Paige Packing Company. A separate corporation, known as Francis Packing Company, owned the equipment utilized by Paige Packing Company. Uppal told Paige that he had investors interested in purchasing the plant.

Paige, Uppal, Dr. Safdar, and other members of the Muslim community had a meeting at Dr. Safdar's office. Dr. Safdar subsequently asked his accountant to determine the feasibility of purchasing Paige Packing Company. In November or December 1989, Dr. Safdar and six other members of the Muslim community (Respondents) decided the purchase was feasible, and chose to pursue the deal. Respondents raised $50,000 for the purchase. Although Uppal contributed no money to the project, he collected Respondents's checks and held them for "safekeeping." Uppal was to be the operation's technical person and "kind of like the gopher for the investors."

Five of the eight checks Uppal collected had blank payee lines because Respondents were not sure what name they were going to give the corporation to be formed for the purpose of buying the packing company. Uppal filled in "Paige–Halal" on these payee lines. The other three checks were made payable to "Paige Islamic Packing House" or "Paige–Halal Packing Co." Respondents never entered into a written agreement with Uppal stating that he could not spend the $50,000 without their prior approval.

At the end of 1989, Dr. Safdar left on a trip out of the country and told Uppal not to spend Respondents's money or cash any of their checks because Uppal lacked the authority. On December 29, 1989, while Dr. Safdar was still away, Paige took Up-

---

1. All statutory references are to 1994 unless otherwise indicated.

pal to Appellant, where Paige did his banking. Uppal opened a checking account (the account) and deposited Respondents's checks. Uppal testified that he deposited the checks because he feared losing them, and also because Paige was anxious to get the deal going. Uppal told Appellant to open the account in the name of "Paige–Halal Meat Co. c/o Mohammed Uppal." Uppal was the sole signatory on the account, understood at the time it was opened that only he had the authority to write checks on the account, and provided Appellant with his home address. The manager of Appellant opened the account with Uppal, but neither party discussed the types of accounts available. After opening the account, in a brief encounter with Appellant's executive vice president James O'Donnell (O'Donnell), Paige introduced Uppal as the "representative of the group." They did not discuss Uppal's status as "representative of the group" in further detail.

When Dr. Safdar returned to the United States in January of 1990, Uppal stated that he opened the account because he feared losing the checks. Dr. Safdar responded by telling Uppal not to spend any money until Respondents made a final decision. Uppal told Dr. Safdar that he could not spend the money because he did not have a checkbook. Uppal also notified some of the other Respondents that he had deposited their checks into the account. However, Respondents did not contact Appellant to state Uppal could not spend the money without their approval.

On February 7, 1990, Respondents's attorney, Michael Stern (Stern), met with Paige and Uppal to discuss structuring the proposed agreement. On the same day, Stern sent a letter to Dr. Safdar and Paige outlining the manner in which the transaction should proceed. Stern suggested that Respondents's $50,000 be used to form a corporation, Paige–Halal Packing Company, to buy the packing equipment from Francis Packing Company. Paige would grant the new corporation a one year option to purchase the real estate, on which

Paige Packing Company operated, for $75,000.

On February 12, 1990, Paige delivered a copy of Stern's letter to Appellant. Russ Greenleaf (Greenleaf), also an executive vice president of Appellant, received the letter. In early March, Greenleaf gave the letter to O'Donnell. O'Donnell placed the letter in Paige's file, but did not read it in detail.

Paige Packing Company was in financial trouble and having difficulties paying its loans to Appellant. For months, Paige had been telling Appellant that he would pay the loans by selling the business. On March 1, 1990, Appellant informed Paige and Foster that Paige Packing Company was in default, and Appellant was accelerating two of their notes. Appellant stated it would foreclose unless it received payment within fifteen days.

On March 8, 1990, Paige, accompanied by Uppal, went to Appellant and asked O'Donnell to explain the situation to Uppal. O'Donnell told Uppal that Appellant demanded payment from Paige Packing Company and would foreclose if it did not pay by March 15, 1990. Paige had never informed Uppal that Paige Packing Company was delinquent on its loan payments. O'Donnell denied Uppal's request to delay the foreclosure. Paige stated that he wanted to do the deal with Uppal. Uppal then asked O'Donnell for a check. O'Donnell provided Uppal with a check and walked away leaving Paige and Uppal to handle their transaction.

Uppal wrote a $50,000 check payable to "Mr. Ralph Paige," and on its face indicated that it was for the purchase of equipment. Paige gave the check to O'Donnell and told him to apply it to the debt of Paige Packing Company. Uppal testified that he told O'Donnell he was not authorized to write said check. However, on cross-examination, Uppal testified he assumed that he had the authority to spend the funds without Respondents's approval. On recross-examination, Uppal admitted

that he stated the following at his deposition:

Question: What did you tell [O'Donnell] about your authority to write out this check if anything?

Answer: No. He did not even ask me.

Question: So, the subject never came up?

Answer: No.

At the March 8, 1990 transaction, Paige and Uppal signed three agreements. By the first agreement, Uppal purchased the equipment of Francis Packing Company for $50,000. Pursuant to the second agreement, Paige guaranteed that the equipment would be on the premises "upon [Uppal's] inspection of the facility." Under the final agreement, Paige purported to sell Uppal 17% of his 49% interest in the unissued stock, of the new corporation Respondents were to form, for $1.00.

Uppal did not inform Respondents of the deal. In late March, Respondents learned of the transaction when an attorney for Paige informed Stern that the money had been paid to Appellant and applied to Paige Packing Company's debt. Stern contacted Appellant, claimed that Uppal had no authority to tender the check to Paige Packing Company, and demanded immediate return of the $50,000 into the account. Appellant refused to return the money.

Respondents, Stern, and Uppal had a meeting. Uppal said that he paid the $50,-000 to Paige because Appellant was prepared to foreclose, and that he would recover Respondents's money by filing a lawsuit against Appellant. Subsequently, at Dr. Safdar's home, Uppal told Respondents that he thought he had authority to spend the money.

On November 20, 1990, Uppal filed suit against Appellant and O'Donnell in St. Louis Circuit Court seeking to recover the $50,000. In August of 1991, Respondents filed a Motion for Leave to Intervene in the Prior Suit. In the motion, Respondents claimed an interest in the $50,000, and in support of the motion stated:

"...that their interest is not adequately represented by existing parties because Plaintiff, [Uppal], is not and never has been their agent, notwithstanding his self-designation as such on the original Petition...."

The court granted the motion; Respondents then filed suit against Appellant and Uppal to recover the $50,000. Respondents obtained a $50,000 Consent Judgment against Uppal. Respondents's suit against Appellant and O'Donnell was voluntarily dismissed without prejudice.

On April 7, 1995, Respondents filed suit against Appellant alleging a violation of the UFL and a claim for fraud. The action was before the Circuit Court of the City of St. Louis from January 27 through 30, 1998. Before the close of their case, Respondents voluntarily dismissed the fraud action with prejudice. Appellant filed a motion for directed verdict on Respondents's claim under the UFL. The trial court denied the motion.

The jury returned a verdict in Respondents's favor and awarded them $85,328.08 (the $50,000 plus prejudgment interest from March 8, 1990 to January 30, 1998). On April 3, 1998, Appellant's motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, was denied. This appeal followed.

■ Appellant first argues the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because Appellant, as a matter of law, could not have violated the UFL in that Uppal did not make a deposit "to the credit of a fiduciary as such" as required by Section 456.290. Appellant contends the trial court disregarded a key provision of the UFL.

■ In reviewing the denial of motions for directed verdict and judgment notwithstanding the verdict, we view the evidence and reasonable inferences therefrom in the light most favorable to the verdict. *Garrett v. Overland Garage & Parts, Inc.*, 882 S.W.2d 188, 190 (Mo.App. E.D.1994). We

disregard any evidence unfavorable to the verdict. *Id.*

■ The UFL encompasses Sections 456.240 through 456.350. It was enacted to facilitate banking transactions by relieving depository banks of their common law duty to inquire into the propriety of fiduciary transactions. *General Ins. Co. of America v. Commerce Bank of St. Charles,* 505 S.W.2d 454, 457 (Mo.App. StL.Dist.1974). Section 456.290 is the only provision of the UFL at issue in this case, and the pertinent part states:

> If a deposit is made in a bank to the credit of a fiduciary as such, the bank is authorized to pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith....

■ The first issue is whether Uppal deposited Respondents's funds "to the credit of a fiduciary as such." Section 456.290 clearly provides that a bank cannot be liable under the UFL unless "a deposit is made...to the credit of a fiduciary as such." The general rules of statutory construction require that we determine the legislative intent by considering the plain and ordinary meaning of the words used in the statute. *Missouri Property & Cas. Ins. v. Pott Industries,* 971 S.W.2d 302, 304 (Mo. banc 1998). Each word, clause, sentence and section of the statute should be given meaning. *Id.* at 305.

■ We find the plain and ordinary meaning of "as such" means in the capacity or character of such a person. Webster's New Collegiate Dictionary, 65, 1163 (1977). It is important that the bank knows the fiduciary nature of the account from the outset. *Metro Trust Co. v. Northwestern Sav. & Loan,* 654 S.W.2d 631, 634 (Mo.App. E.D.1983).

Appellant argues that there was no violation of the UFL because Uppal deposited Respondents's funds in his individual, rather than fiduciary, capacity. In reply, Respondents rely on *Trenton Trust Co. v. Western Surety Co.,* 599 S.W.2d 481 (Mo. banc 1980), to argue that Section 456.290 can be violated by a bank even though funds were not deposited in an account with a designation that demonstrated a fiduciary relationship.

In *Trenton Trust,* a mother (mother) was appointed guardian for the proceeds her two minor children received from their father's insurance policy. *Id.* at 484. The faces of the checks indicated mother was a guardian, and furthermore, mother testified that she told the bank she was depositing the funds for her children. *Id.* at 485. Mother put the funds into certificates of deposit and savings accounts; however, these investments did not reflect the fiduciary character of the funds. *Id.* at 485. The bank later allowed mother to use these funds as collateral for personal loans. *Id.* at 484. When problems arose, the bank claimed it did not know these were funds held in a fiduciary capacity because the accounts did not demonstrate a fiduciary relationship. *Id.* at 486. The court found the bank had actual knowledge of the ownership of the funds and thus had actual knowledge the guardian was committing a breach of her fiduciary obligations. *Id.* at 493.

However, in the case at bar, Uppal deposited the $50,000 in the name of "Paige–Halal Meat Co. c/o Mohammad Uppal." Uppal was the sole signatory on the account, understood at the time it .was opened that only he had the authority to write checks on the account, and provided Appellant with his home address. The checks did not indicate Uppal was depositing these funds in a fiduciary capacity. Uppal did not inform the bank that the funds were not his. There was no indication from the outset that Uppal was opening this account to the credit of a fiduciary. Unlike *Trenton Trust,* there is not suffi-

cient evidence that Appellant was dealing with a fiduciary or had actual knowledge of the ownership of the funds.

Upon review in the light most favorable to the verdict, we find Appellant's first point dispositive. Appellant is not liable to Respondents under the UFL because the statutory prerequisite for such liability was not met in that there were not sufficient factual allegations demonstrating Uppal deposited Respondents's funds "to the credit of a fiduciary as such."

The judgment is reversed.

CRANDALL, Jr., Judge, and AHRENS, Judge, concur.