Connie HENDREN, Successor Personal Representative of the Estate of Phyllis DeLaRosa and Derrick DeLaRosa, Appellants,

v.

FARMERS STATE BANK, S.B., Respondent.

No. WD 69011.

Missouri Court of Appeals, Western District.

Oct. 28, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 2008.

Application for Transfer Denied Jan. 27, 2009.

Thomas M. Schneider, Columbia, MO, for appellant.

Jerry M. "Jay" Kirksey, Bolivar, MO, for respondent.

Before JAMES M. SMART, JR., P.J., THOMAS H. NEWTON, and RONALD R. HOLLIGER, JJ.

JAMES M. SMART, JR., Judge.

The Estate of Phyllis DeLaRosa appeals the summary judgment entered in favor of Farmers State Bank with respect to claims pertaining to the misappropriation of funds by a fiduciary. On appeal, the estate claims its evidence demonstrated the elements necessary to succeed under the Uni-

form Fiduciaries Law. The judgment is affirmed in part and reversed in part.

## Facts

The DeLaRosa Estate was opened in April 1991. Derrick DeLaRosa was the sole beneficiary. Nancy Coyner was appointed personal representative and conservator in the estate. In June 1992, Ms. Coyner deposited funds owned by the estate into an estate savings account opened on that date at Farmers State Bank ("the Bank").

On January 28, 1995, Ms. Coyner withdrew $64,664.17 of estate funds from the estate savings account and deposited those funds into a new account opened on the same date at the Bank in the individual names of Ms. Coyner and her daughter. The account was a personal joint account with right of survivorship. On January 31, 1995, Ms. Coyner used estate funds to open three custodial savings accounts in the amount of $10,000 each at the Bank in the names of or for the benefit of three of her grandchildren. Also, on January 31, 1995, Ms. Coyner withdrew $34,664.17 or $44,664.17 in cash.

Ms. Coyner subsequently wrote three checks, payable to the Bank, drawn from an estate account at a different bank, Roosevelt Bank. The checks were in the amounts of $20,000, $9,000, and $10,000, and were written in late 1995 and early 1996.

Ms. Coyner passed away in April 1996. Connie Hendren, the successor personal representative, after entering on her duties, concluded that all of the transactions mentioned above were unauthorized. The estate filed suit against the Bank, Ms. Coyner's daughter, and Ms. Coyner's three grandchildren in an attempt to recover the funds allegedly wrongfully appropriated. The estate ultimately dismissed all parties except the Bank. The Bank moved for summary judgment. Summary judgment was granted in the Bank's favor.

## Standard of Review

Review of summary judgment is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The summary judgment movant must demonstrate that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 381. "For purposes of Rule 74.04, a 'genuine issue' exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts." *Id.* at 382. "A 'genuine issue' is a dispute that is real, not merely argumentative, imaginary or frivolous." *Id.*

## Uniform Fiduciaries Law

The Uniform Fiduciaries Law (UFL) is found at sections 469.240 through 469.350.[1] It was intended "to facilitate banking transactions by relieving depository banks of their common law duty to inquire into the propriety of fiduciary transactions." *Bari v. Lindell Trust Co.*, 996 S.W.2d 655, 659 (Mo.App.1999). It "permits depository banks to indulge in the presumption that the fiduciary in withdrawing funds from the fiduciary account is acting lawfully and in accordance with his duties." *Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo.App.1974).

Section 469.270 provides:

---

1. The UFL was renumbered from section 456.240 to 456.350 by the Missouri legislature on July 9, 2004. 2004 Mo. Laws 786 [H.B. 1511, 92d Gen. Assem., Second Reg. Sess.]. This court will cite the renumbered version.

If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith.

Section 469.310 provides:

If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary, or of checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

▪ "The relation of a bank to a trustee-depositor is that of creditor and debtor." *Gen. Ins. Co. of Am.*, 505 S.W.2d at 458. "The bank's obligation [is] to the trustee, to honor his checks when drawn to form." *Id.* "It owes no duty to the trust estate save to refrain from participating in misappropriation of the funds." *Id.* "The mere payment of the money to or upon the check of the depositor does not constitute a participation in an actual or intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust." *Id.* "Such circumstances do not impose upon the bank the duty or give it the right to institute any inquiry into the conduct of its customer, in order to protect those for whom the customer may hold the fund, but between whom and the bank there is no privity." *Id.*

▪ "The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and when [the checks are] drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his duty and to honor them accordingly." *Id.* at 458–59 (*quoting Cent. Nat'l Bank of Baltimore v. Conn. Mut. Life Ins. Co.*, 104 U.S. 54, 64, 26 L.Ed. 693 (1881)). The bank has no duty to inquire whether the fiduciary properly applies funds held in trust. "[M]ere negligence on the part of the depository bank is not sufficient to hold it liable to the principal if the fiduciary in fact misappropriated the fund." *Trenton Trust Co. v. Western Sur. Co.*, 599 S.W.2d 481, 490 (Mo. banc 1980), *superseded by statute on other grounds as stated in Chouteau Auto Mart, Inc. v. First Bank of State*, 55 S.W.3d 358, 362 (Mo. banc 2001). Pursuant to the UFL, a bank is not liable for a fiduciary's breach

of duty "unless there is a showing of the bank's actual knowledge of a breach of fiduciary duty or bad faith on the part of the bank." *Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A.*, 803 S.W.2d 23, 30 (Mo. banc 1991).

■■■■■ " 'Actual knowledge,' as the terms are used in the Law, means awareness that, at the moment, the fiduciary was defrauding the principal." *Gen. Ins. Co. of Am.*, 505 S.W.2d at 457. "It means express factual information that the funds are being used for private purposes in violation of the fiduciary relationship." *Id.* A bank may not be found to possess "actual knowledge" of a breach of trust merely because "at some stage of the handling of the fiduciary account it could, by inspection of public records or by piecing together all the facts known by different employees of the bank, become aware of a breach of trust." *Id.*

■■■■■ "Bad faith" is not defined in the UFL. *Id.* "Good faith," however, is defined in section 469.240(2), which states: "A thing is done 'in good faith' within the meaning of sections 469.240 to 469.350, when it is in fact done honestly, whether it be done negligently or not." " 'Bad' being the antonym for 'good,' it then follows that a thing is done in 'bad faith' when it is in fact done dishonestly and not merely negligently." *Gen. Ins. Co. of Am.*, 505 S.W.2d at 457. "Moral guilt is not however comprehended within this term 'bad faith.' " *Id.* at 457–58. "Evil motive is not the gauge; it is whether it is 'commercially' unjustifiable for the (bank) to disregard or refuse to learn facts readily available." *Id.* at 458. "The facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." *Id.*

## $64,664.17 in the Estate Account at the Bank

On appeal, the estate claims the trial court erred in granting summary judgment in the Bank's favor with respect to the $64,664.17 transferred from the estate account to Ms. Coyner's personal account and then to various personal accounts. The estate argues that the Bank had actual knowledge of the breach of fiduciary duty by Ms. Coyner. Alternatively, it argues that the Bank acted in bad faith.

The parties agree that either actual knowledge or bad faith is necessary for the estate to prevail under the UFL. The Bank argues that the estate is able to show only that the transactions occurred. No witness offers independent recollection of the events at issue. The witnesses merely confirmed their initials and bank procedures. The bank argues that the bank transactions alone are patently insufficient.

■■■ The estate focuses upon the circumstances of the misappropriation. All relevant transactions were personally handled by the same person, Patty Russell, a vice president of the Bank (who apparently also filled in as a teller). The vice president transferred the entire estate balance of $64,664.17 into a personal account opened in the name of Ms. Coyner and her daughter. Three days later, the vice president paid out $14,664.17 in cash to Ms. Coyner and opened three custodial accounts in the names of Ms. Coyner's minor grandchildren. The depleted estate account was identified as an estate account on all bank records.

The estate points to the fact that Ms. Russell, the Bank vice president, submitted a letter of resignation to the Bank the same day she received a subpoena to produce records in connection with the estate account. The estate argues that the vice

president's resignation is compelling with respect to the estate's argument that the vice president knew the funds were being misappropriated.

We agree that the timing of the resignation creates a suspicion. The vice president evidently believed she would be unable to continue her employment at the Bank. However, we are not sure that it shows that she knew she was guilty of bad faith or dishonesty; it could show that she believed she was negligent, or would be considered negligent and, therefore, anticipated discharge by the Bank. There is no evidence shown of any relationship between Ms. Russell and Ms. Coyner. That being the case, the resignation, taken alone, is sufficiently ambiguous as to blunt the force of the logical inference that Ms. Russell had a guilty mind at the time of the transactions. We believe that under the UFL the mere suspicion of actual knowledge or bad faith arising from the resignation is not such as to create a submissible case against the Bank.

The estate suggests some other facts and circumstances, such as the difference between the names Coyner and DeLaRosa, are significant. The estate suggests that because of the name difference there was a clue that it was unlikely that the transfers were bequests to Ms. Coyner. The estate further points to the fact that the transaction was reported to the Bank president on an anti-fraud internal control report known as a large transaction report. A forfeited interest report also went to the Bank president in the ordinary course of business reflecting that the estate account had forfeited $244.48 in interest at the time of the wholesale transfer of funds. The argument is that the Bank should have been alerted to a possible defalcation.

■■■ These factors are nothing more than mere hints or possible clues

that give rise to a question of impropriety. The UFL was designed to avoid placing responsibility on banks to investigate when there is a hint of an impropriety. *See Bari v. Lindell Trust Co.*, 996 S.W.2d 655. The UFL rejects the notion that the Bank has a duty to investigate. *Id.* The statutes are clear that there is no liability unless the Bank had either actual knowledge or acted in bad faith with respect to the misappropriation. Sections 469.270 and 469.310.

■■■ Mere negligence, as we have noted, is insufficient to amount to "bad faith." *Trenton Trust Co.*, 599 S.W.2d at 492. Bad faith or dishonesty, unlike negligence, involves willful acts or omissions. *Id.* "The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith, unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, that is to say, where there is an intentional closing of the eyes or stopping of the ears." *Id.* (internal citation omitted). Here, while the evidence shows that the Bank had hints of the possibility of dishonesty, there simply is inadequate evidence to show that the Bank was willful in its failure to recognize the misappropriation.

Cases cited by the estate are distinguishable. In *Trenton Trust Co.*, 599 S.W.2d at 493, the guardian testified that she and the bank employee probably discussed the fiduciary nature of the certificates of deposit she used as collateral for a personal loan. Moreover, the breach of fiduciary duty resulted in a benefit for the bank in that it received security for loans extended to the guardian. *Id.* at 494. Similarly, in *Metro Trust Co., Guardian of Estate of Huber v. Northwestern Savings & Loan Ass'n*, 654 S.W.2d 631 (Mo.App. 1983), and *State ex rel. Paden v. Carrel*, 597 S.W.2d 167, 174 (Mo.App.1979), the

breach of fiduciary duty resulted in a benefit for the banks in that the fiduciary assets secured loans extended to the fiduciary. This benefit to the banks is substantial evidence of bad faith. *See Gen. Ins. Co. of Am.,* 505 S.W.2d at 457.

This court's review of the evidence leaves it convinced that the evidence, as a matter of law, does not rise to the level of creating a submissible case of bad faith or actual knowledge. While the Bank's vice president was possibly negligent (or worse) in view of the totality of the facts, there is no evidence that creates a submissible case of bad faith or actual knowledge. The evidence does not demonstrate that the Bank vice president had express factual information as to misappropriations at the exact moment of the transfer from the estate account to Ms. Coyner's personal account. *See id.*

The evidence advocated by the estate here is not substantial evidence that could support a finding that the Bank had actual notice or acted in bad faith as to the $64,664.17. The estate does not argue that summary judgment was premature or that it needed more time for discovery, and there is no reason to believe that the estate was capable of discovering more evidence. In view of the lack of any substantial evidence of actual knowledge or bad faith as to $64,664.17, we conclude that summary judgment in the Bank's favor was not error as to that portion of the petition.

### $39,000 from the Three Checks

■ The estate also claims the trial court erred in granting summary judgment to the Bank with respect to the $39,000 from checks drawn by Ms. Coyner on an account at a different bank and made payable to the Bank. The parties characterize the claim pertaining to the three checks as a claim for conversion. The claim concerning the $39,000 was not set out as a separate count, so it was not entirely clear from the petition what the exact theory is, though the estate states that it is also a claim under section 469.270 of the UFL. In any event, we look to the operative facts pleaded and those which are undisputed on the motion for summary judgment to see if any claim is stated, whether under the UFL, the Uniform Commercial Code, or the common law.

The three checks were written in late 1995 and early 1996. In the Bank's answers to interrogatories, the Bank admitted receiving the proceeds of the three checks. Though the Bank claims that the proceeds were deposited to the estate savings account, the Bank has no evidence, documentary or otherwise, to support that assertion. The records pertaining to the proceeds of the three checks are, according to the Bank, no longer available. The Bank knew as early as 1999 that there were claims of discrepancies and missing funds with regard to the DeLaRosa Estate. Yet the Bank now has no records concerning the proceeds of the three checks. All that is known is that the Bank received the $39,000 in proceeds. What happened after the Bank's receipt of the money is unknown.

The Bank acknowledges that the funds were not tendered for the Bank to keep, as in payment of a debt owed the Bank. That being the case, the burden is on the Bank to protect itself from the presumption that the Bank improperly benefited from the funds. We do not address this as an issue of spoliation of evidence; we address it simply as an issue of recognizing that the Bank received the funds, and, because the funds are now missing without explanation while the estate contends the funds disappeared, the Bank cannot say there is no dispute as to any material fact. Because the Bank does not account for those funds beyond its naked, undocumented assertion that it placed the funds on deposit (to be

drawn by Ms. Coyner), there is an issue of material fact arising from the inference that the Bank improperly benefited from the funds. By the production of appropriate evidence in its favor, if any exists, the Bank, on remand, may be able to overcome the presumption of bad faith and the presumption that the Bank still owes the funds to the estate. *See, e.g., Gen. Ins. Co. of Am.,* 505 S.W.2d at 457.

Because the petition in this case could have more explicitly distinguished the claim as to the treatment of the $39,000 from the claim as to the other funds which the Bank could show were withdrawn by Ms. Coyner, it would have been easy for the trial court to fail to recognize the difference. However, granting a liberal reading of the petition and the materials filed in connection with the motion for summary judgment, one can discern the difference that arises from the fact that the Bank could not show that it placed the funds on deposit for the use of the estate. Our duty is to discern whether the factual assertions which were not defeated by the defendant give rise to a cause of action which cannot be decided against the estate as a matter of law. Summary judgment in favor of the Bank on the allegations pertaining to the three checks was erroneous because the Bank was not entitled to judgment as a matter of law.

### Conclusion

The summary judgment with respect to the $64,664.17 in the estate funds is affirmed. The summary judgment with respect to $39,000 from the three checks is reversed. The case is remanded for further proceedings not inconsistent with this opinion.

All concur.