William H. TOPPER, M.D.,
Respondent,

v.

MIDWEST DIVISION, INC.,
et al., Appellants.

No. WD 70323.

Missouri Court of Appeals,
Western District.

Feb. 2, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 2010.

D. Bruce Keplinger, for Respondent.

Thomas C. Walsh, for Appellants.

Before Division Two: VICTOR C. HOWARD, Presiding Judge, JOSEPH M. ELLIS, Judge and MARK D. PFEIFFER, Judge.

JOSEPH M. ELLIS, Judge.

Midwest Division, Inc. d/b/a HCA Midwest Division; HCA Physician Services, Inc.; Midwest Division–RMC, LLC d/b/a Research Medical Center; and Centerpoint Medical Center of Independence, LLC appeal from a judgment entered in the Circuit Court of Jackson County in favor of Dr. William H. Topper in his action for tortious interference with contract and defamation. For the following reasons, we reverse in part and remand the cause for further proceedings.

In 2004, Dr. Topper was employed by Pediatrix, a national physician group that places neonatologists in hospitals around the country, and served as the director of the neonatal intensive care unit ("NICU") at Research Medical Center ("Research") in Kansas City, Missouri, where he had held that position since 1991. At some point that year, Dan Jones, the CEO of the Medical Center of Independence ("MCI") asked Dr. Topper to direct, and his group to staff, the neonatal intensive care unit at

MCI which was to eventually be moved to Centerpoint Medical Center ("Centerpoint"). Centerpoint was then under construction and was to take the place of MCI. Because of other contractual obligations, Pediatrix could not allow its employees to work at MCI or Centerpoint. Jones and Kevin Hicks, the CEO for Research, jointly asked Ken Washington, group vice-president for HCA Physician Services, to look into buying out the Pediatrix contract so that HCA Physician Services could employ Dr. Topper's group and allow that group to service the NICUs at those hospitals. HCA Physician Services subsequently bought out the Pediatrix contract and formed Midwest Newborn Care, LLC to employ the members of Dr. Topper's group. Dr. Topper executed an employment agreement with Midwest Newborn Care in August 2005 under which he was to serve as director of the NICUs at Research and MCI/Centerpoint.

By June 6, 2006, Jones and Hicks had decided to look into replacing Dr. Topper. Prior to September 2006, they approached Dr. Kathleen Weatherstone, the director of the NICU at Overland Park Regional Hospital, about taking over for Dr. Topper and absorbing the rest of his group into her own group, Sunflower Neonatology. On March 6, 2007, Jones and Hicks met with Dr. Topper and informed him that he was going to be terminated and that Dr. Weatherstone would be replacing him as director of the NICUs. On June 30, 2007, Pat Kueny, who had replaced Washington as vice president of HCA Physician Services, sent Dr. Topper a letter on behalf of Midwest Newborn Care notifying him that his employment with Midwest Newborn Care would be officially terminated in 120 days, pursuant to the notice provisions of the employment agreement, and directing him not to report for work anymore at either Research or Centerpoint. The letter also notified Dr. Topper that Midwest Newborn Care intended to enforce the two-year covenant not to compete contained in his employment agreement.

Following his termination, Dr. Topper filed an action against HCA Midwest, HCA Physician Services, Midwest Newborn Care, Research, and Centerpoint.[1] In that petition, he asserted claims of defamation, tortious interference with contract, antitrust, and conspiracy to defraud. He sought actual and punitive damages, a declaration that his covenant not to compete was invalid, and an injunction against the enforcement of the covenant not to compete.

The case was eventually tried to a jury, and Dr. Topper submitted claims for tortious interference with contract against HCA Midwest, HCA Physician Services, Research, and Centerpoint; for defamation against Research and Centerpoint; and for restraint of trade against HCA Midwest, HCA Physician Services, Research, and Centerpoint. He requested punitive damages on tortious interference and defamation claims. The jury found in favor of Dr. Topper on his tortious interference and defamation claims. It awarded Dr. Topper $1,100,000 in actual damages on the tortious interference claim and assessed punitive damages of $250,000 against HCA Midwest, $500,000 against HCA Physician Services, $250,000 against Research, and $1,100,000 against Centerpoint. On the defamation claim, the jury awarded Dr. Topper $1,000,000 in actual damages and assessed $250,000 in punitive damages against Research and $500,000 against Centerpoint. On July 9, 2008, the trial court entered judgment on the jury's verdicts, having denied the defendants' motion for judgment notwithstanding the

1. Dr. Topper eventually dismissed his claims against Midwest Newborn Care.

verdict. The defendants bring seven points on appeal.

■ In their first point, Appellants contend that the trial court erred in submitting Dr. Topper's tortious interference claim to the jury because it was not supported by sufficient evidence. "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantive evidence." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Kelly v. State Farm Mut. Ins. Co.*, 218 S.W.3d 517, 520–21 (Mo.App. W.D.2007) (internal quotation omitted). "In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with the verdict." *Clevenger*, 237 S.W.3d at 590. "This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Id.*

■ "The elements of tortious interference with a business relationship are: (1) The plaintiff was involved in a valid business relationship; (2) the defendant was aware of the relationship; (3) the defendant intentionally interfered with the relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of defendant's conduct." *Clinch v. Heartland Health*, 187 S.W.3d 10, 14 (Mo.App. W.D.2006). Appellants claim that Dr. Topper could not establish that he had a reasonable expectancy that his employment would continue because his contract provided that he was termina-

ble at will by Midwest Newborn Care. They further assert that the evidence established that their actions were justified and that they did not utilize improper means in seeking to have Dr. Topper's employment terminated.

■ The fact that Midwest Newborn Care did not breach the terms of the employment contract in terminating Dr. Topper because he was terminable at will does not free others not party to the contract from liability if they tortiously interfered with that relationship. *Id.* at 15. "A third party's interference with contracts terminable at will is actionable, because, until one of the contracting parties terminates the contract, the parties are in a subsisting relation that presumably will continue and is of value to the plaintiff." *Id.* That Midwest Newborn care did not breach its contract with Dr. Topper is of no consequence in determining whether or not non-parties tortiously interfered in that relationship. *Id.* The pertinent issue is whether or not Midwest Newborn Care would have persisted in that contractual relationship with Dr. Topper but for the conduct of the non-parties. *Id.* The record clearly reflects that the sole reason for Midwest Newborn Care terminating Dr. Topper was because Jones and Hicks convinced Kueny to do so. Absent the actions of Jones and Hicks, the employment relationship would have persisted.

■ We must, therefore, examine Appellants' claim that they were justified in convincing Midwest Newborn Care to fire Dr. Topper. "If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. banc 2006). A com-

pany can certainly have a valid interest in controlling who performs work for it. *Id.* A hospital undoubtedly has a legitimate interest in dictating who directs its various departments and which doctors provide the services for which it charges. Indeed, the managing authorities of a private hospital have the discretion to exclude a physician from practicing therein at all. *Misischia v. St. John's Mercy Med. Ctr.,* 30 S.W.3d 848, 863 (Mo.App. E.D.2000). Likewise, the undisputed evidence reflects that HCA Physician Services was the owner of Midwest Newborn Care and that it managed the operations of Midwest Newborn Care.

The only argument offered by Dr. Topper that these defendants did not have legitimate interest in his employment is that he is not an employee of any of those entities. The simple fact that the defendants were not parties to the employment contract does not preclude them from having a valid interest in his employment. *See Stehno,* 186 S.W.3d at 252. On the record herein, the jury could not have reasonably found that Research, Centerpoint, or HCA Physician Services lacked a valid interest in Midwest Newborn Care's employment of Dr. Topper.

■ Regardless of whether they had justification for interfering with his employment relationship, however, "the interfering part[ies] must not employ improper means." *Id.* "Using improper means to interfere will destroy any justification a defendant might otherwise assert no matter what sort of relationship was involved." *Clinch,* 187 S.W.3d at 17. "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraints of trade, or any other wrongful act recognized by statute or the common law." *Stehno,* 186 S.W.3d at 252. "Unreasonable use of a privilege for an improper purpose, such as perpetrating a deliberate lie, will forfeit the privilege." *Hensen v. Truman Med. Ctr., Inc.,* 62 S.W.3d 549, 557 (Mo.App. W.D.2001) (internal quotation omitted).

■ As will be discussed in more detail *infra,* the record reflects that, as they were plotting to get rid of Dr. Topper, Jones and Research slandered and utilized false statistics to make it appear that Dr. Topper deserved to be fired. Jones falsely told multiple executives within the various companies, including Kueny, that Dr. Topper had created a hostile work environment, had maliciously subverted the NICU, and had acted unprofessionally. Research produced a study misrepresenting that there was an excessively high newborn mortality rate at the hospital. While Jones, Hicks, and Kueny denied that such methods were used to convince Kueny that Midwest Newborn Care should fire Dr. Topper, the jury was not required to find that testimony credible and could have inferred that the actions of Jones and Hicks influenced that decision. Moreover, the jury could infer from other testimony that Jones, Hicks, and Kueny were afraid of the reaction of other employees in the NICU and, therefore, utilized these methods in an attempt to minimize the fallout from firing Dr. Topper. Misrepresentations and defamation certainly constitute improper means that serve to destroy any justification the defendants had. *Clinch,* 187 S.W.3d at 17. Point denied.

In their second point, Appellants challenge the submission of the defamation claim as being unsupported by substantial evidence in multifarious ways. Appellants first argue that a statement made by Kathy Fox, a nurse manager, was merely an opinion and, therefore, not actionable. They next claim that the newborn mortality statistics created and released by Research did not identify Dr. Topper and

were not false. Third, Appellants assert that Hicks and Jones were Dr. Topper's supervisors, that their statements were merely opinions, and that their comments were privileged. Finally, Appellants claim that Dr. Topper was not damaged by any of the defamatory material.

■■■ To establish a submissible case of defamation, the plaintiff "must plead and prove the following elements: (1) publication, (2) of a defamatory statement, (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) damages the plaintiff's reputation." *Deckard v. O'Reilly Auto., Inc.,* 31 S.W.3d 6, 18 (Mo.App. W.D. 2000).[2] "In a defamation claim where the plaintiff is not a public figure, the requisite degree of fault is negligence." *Id.* at 21.

With regard to the defamation claims against Research Medical, the jury was instructed:

Your verdict must be for plaintiff if you believe:

First, defendant Midwest Division RMC, d/b/a Research Medical through Kevin Hicks disseminated false statistic regarding neonatal outcomes in the NICU under Dr. Topper's direction and/or through Kathy Fox falsely stated [sic] that Dr. Topper brought his termination on himself, and

Second, defendant Midwest Division RMC, d/b/a Research Medical Center was at fault in making such statements, and

Third, such statements tended to expose plaintiff to contempt and damaged his reputation, and

Fourth, such statements were heard by Dan Jones, physicians, nurses and nurse practitioners working at Research Medi-

cal Center or Centerpoint Medical Center, and

Fifth, plaintiff's reputation was thereby damaged.

■■■ As noted in *Powderly v. South County Anesthesia Associates, Ltd.,* 245 S.W.3d 267, 276–77 (Mo.App. E.D.2008) (internal citations omitted):

An instruction must be supported by substantial evidence. Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case. A party is entitled to an instruction on any theory supported by the evidence.... In the case of a disjunctive instruction, each submission must be supported by substantial evidence.

Appellants argue that the evidence could not support a finding that the statements made by Fox were defamatory and that the newborn fatality statistics were not false and did not identify Dr. Topper.

The sole testimony related to the statements made by Kathy Fox came from Brenda Bieler, a nurse who worked at Research with Dr. Topper. The sum total of her testimony on that subject was as follows:

Q: Who was Kathy Fox?

A: Kathy Fox was a clinical nurse leader.

Q: And did you know her to be an administrator at Research Medical Center?

A: I didn't consider her administration but she was part of management.

Q: What did Ms. Fox say to you about Dr. Topper?

A: We were in a conversation. I was involved with two other nurses talk-

2. Overruled on other grounds in *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. Banc 2003).

ing and she came into the conversation, and the conversation was about that Dr. Topper was leaving. And she stated that Dr. Topper had brought all of this on himself.

■■■ "A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to defer third persons from associating or dealing with him." *Deckard*, 31 S.W.3d at 19. "Whether a statement is capable of having a defamatory meaning is a question of law for the trial court." *Id.* "[W]ords are to be taken in the sense which is most obvious and natural according to the ideas they are calculated to convey to those to whom they are addressed." *Id.* (internal quotation omitted).

■■■ Expressions of opinion are privileged under the First Amendment's guarantee of freedom of speech. *State ex rel. Diehl v. Kintz*, 162 S.W.3d 152, 155 (Mo.App. E.D.2005). Thus, to support his claim of defamation, Dr. Topper was required to establish that Fox misinformed the nurses concerning facts, not merely expressing her opinions. *Clinch*, 187 S.W.3d at 17. "The test for an ostensible opinion is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Diehl*, 162 S.W.3d at 155. "Opinions ... become facts if they can be verified." *Clinch*, 187 S.W.3d at 18. "Whether a statement is fact or opinion is a question of law, and we make this determination based on the totality of the circumstances surrounding a given statement." *Id.* at 17–18. "Courts should also examine the statements themselves to determine whether they are too imprecise." *Diehl*, 162 S.W.3d at 155 (internal quotation omitted).

■■■ Based upon Bieler's testimony, no reasonable factfinder could conclude that Fox's statement was an assertion of objec-

tive fact. Furthermore, given the limited context provided by the evidence and the imprecise nature of the statement that "Dr. Topper had brought all of this on himself," we are unable to discern how the truth or falsity of the statement could be determined. Finally, no evidence was presented indicating that the Fox's statement damaged Dr. Topper or affected his reputation in any way.

In short, the evidence presented at trial did not support Dr. Topper's claim of defamation against Research based upon Fox's statement. The trial court erred in submitting that claim to the jury.

■■■ As to Dr. Topper's claim against Research resulting from its publication of false newborn mortality rates that cast him and his department in a bad light, the evidence is more substantial. Dennis Beers, the director of quality improvement at Research, compiled and presented at a meeting of the Department of Obstetrics statistics reflecting an abnormally high mortality rate for newborns at Research. The statistics were titled "Trending for Newborns Mortality Rate Research MC." Shortly after these statistics were published, it was announced that Dr. Topper was being terminated as the director of the NICU at Research.

Nancy Mense, a neonatal nurse-practitioner at Research, was responsible for keeping the mortality records for the NICU. Her statistics on newborn mortality differed substantially from those assembled by Beers, which were notably higher.

Dr. Topper said that the statistics presented by Beers did not accurately reflect the newborn mortality rate at Research. Dr. Topper testified that a newborn is defined as "a baby who is born alive until 28 days of age." He noted that a stillbirth would not be a newborn or included in such mortality rates and that a child dying

after the 28 days would not be a newborn death. Dr. Topper stated that publishing statistics with the death rate for newborns reflected in Beer's report "makes [his] management of the nursery look very bad." Dr. Manimtim similarly testified that he believed the data reflected in Beers statistics inaccurately reflected the mortality rate for the NICU.

Beers testified that, in accumulating data for his Trending for Newborn Mortality Rate chart, he included any baby that was born and took a breath and that there was no age cutoff for determining what a newborn was. Thus, he included in the numbers the deaths of children that were not newborns as the term is used in the medical community. Beers stated that he did not know whether there were standard definitions for terms like newborn or infant. Beers said that he simply devised his own definition for newborn using his own common sense and did not consult any medical text, doctor, or the risk management department for such a definition. Beers stated that he did not check with the NICU or risk management had different numbers from his own.

 Accordingly, the evidence supported a finding that Beers negligently or intentionally misrepresented facts readily associated with Dr. Topper that damaged his reputation with obstetricians and others affiliated with the hospital. A misrepresentation of the mortality rate for a doctor can be sufficient to support a defamation claim. *Clinch*, 187 S.W.3d at 18. "Whether a doctor's infection and morbidity rates are above the accepted standards and, therefore, cause for concern, are verifiable facts." *Id.* The evidence regarding dissemination of false statistics was sufficient to support Dr. Topper's claim of defamation against Research.

 Appellants next argue that the statements made by Jones that formed the basis for Dr. Topper's defamation claim against Centerpoint were opinions that were unverifiable. He further claims that comments were protected by intra-corporate qualified privilege.

The evidence reflects that Jones told corporate officers and employees, including Kueny, that Dr. Topper created a hostile work environment in the NICU, maliciously subverted the NICU, and displayed unprofessional conduct. These are assertions that Dr. Topper committed tortious and unprofessional acts. The truthfulness of such comments is capable of verification. Accordingly, these are not statements of opinion subject to First Amendment privilege.

 We next turn to Appellants' claim that Jones's statements were subject to the qualified privilege afforded to intra-corporate communication. "A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable." *Rice v. Hodapp*, 919 S.W.2d 240, 244 (Mo. banc 1996) (internal quotation omitted). "The applicability of the defense of qualified privilege is a matter of law to be decided by the trial court." *Id.* (internal quotation omitted). In order to be protected by the intra-corporate communication privilege, the statement must have been made in good faith and without malice. Malice is established if the evidence demonstrates that "the statements were made with knowledge that they were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubts as to whether they were true." *Id.* (internal quotation

omitted). "Whether the defendant acted with malice is a question of fact for the jury." *Bugg v. Vanhooser Holsen & Eftink P.C.,* 152 S.W.3d 373, 377 (Mo.App. W.D.2004).

In this instance, the evidence sufficiently supports a determination by the jury that Jones lacked good faith in making his statements. The jury could well have found his explanation regarding the facts he claimed justified those comments was highly suspect and that Jones knew or should have known that his statements were false.

▮ Appellants' last argument related to the defamation claims is that the evidence did not establish that Dr. Topper sustained any damages as a result of the defamatory comments. " 'Proof of actual reputational harm is an absolute prerequisite in a defamation action.' " *Johnson v. Allstate Indem. Co.,* 278 S.W.3d 228, 235 (Mo.App. E.D.2009) (quoting *Kenney v. Wal–Mart Stores, Inc.,* 100 S.W.3d 809, 817 (Mo. banc 2003)). Having reviewed the record, we find sufficient evidence of damages in the record.

The jury could reasonably infer that Jones's defamatory comments influenced the decision to terminate Dr. Topper. Jones testified that he had six to twelve meetings with Hicks, Rogers, Kueny, and others to discuss terminating Dr. Topper. Jones stated that Dr. Topper's unprofessional behavior, creation of a hostile work environment, and his efforts to subvert the NICU were influential variables in the decision to terminate him. Thus, the jury could reasonably have determined that Jones's false statements in those regards lead to Dr. Topper's termination and thereby damaged him.

▮ We next consider whether sufficient evidence was presented that Dr. Topper sustained damages from the publi-

cation of the erroneous newborn mortality statistics. Dr. Topper testified that he first became aware of these false statistics when they were presented at an obstetrics department meeting at Research to obstetricians, family practitioners, nurses, and staff. He stated that the statistics made his management of the nursery look very bad. Furthermore, the statistics were compiled and published prior to Dr. Topper's termination. "Ultimately, the question of whether a plaintiff's damages were caused by the defamatory statement is for the jury to decide." *Id.* at 236 (internal quotation and brackets omitted). The jury may well have inferred that these statistics played a role in the removal of Dr. Topper as the director of the NICU shortly after they were published. Point denied.

▮ In their third point, Appellants argue that the trial court erred in allowing Dr. Topper to testify that Kenneth Washington had assured him that HCA was making a long-term commitment to him and that he anticipated that Dr. Topper's employment contract would be renewed after its four-year term expired. Appellants claim that the admission of this evidence violated the parol evidence rule.

▮ "A trial court has broad discretion to admit or exclude evidence at trial." *State v. Madorie,* 156 S.W.3d 351, 355 (Mo. banc 2005). We reverse only where the court has abused its discretion. *Id.* "[T]he parol evidence rule is a substantive rule of contract law and exists to preserve the sanctity of written contract." *Kenney v. Vansittert,* 277 S.W.3d 713, 719 (Mo.App. W.D.2008). "The parol evidence rule prohibits evidence of prior or contemporaneous agreements to vary or contradict the terms of an unambiguous and complete contract absent fraud, common mistake, accident or erroneous admission." *Celtic Corp. v. Tinnea,* 254 S.W.3d 137, 142 (Mo. App. E.D.2008). "If a written contract

appears within its four corners to be complete, then the parol evidence rule operates to exclude evidence contradicting the instrument." *Kenney,* 277 S.W.3d at 719. The parol evidence rule "does not apply to parol testimony that does not contradict the terms of an integrated agreement." *Wheelhouse Marina Real Estate, L.L.C. v. Bommarito,* 284 S.W.3d 761, 770 (Mo.App. S.D.2009).

The testimony offered by Dr. Topper did not contradict the terms of the contract. Dr. Topper readily acknowledged that the term of the contract was four years. He simply testified that Washington expressed to him, both before and after the contract was executed, that HCA was committed to making the relationship work and that HCA anticipated renewing the contract in the future.

Dr. Topper never claimed to have a contractual right to be employed by HCA through his retirement, indeed he readily acknowledge that he was terminable at-will under the contract. The evidence he presented was relevant to establish that he was in a subsisting employment relationship that would presumably continue. The pertinent issue that this evidence went to was whether Midwest Newborn Care would have persisted in that employment relationship with Dr. Topper but for the conduct of the non-parties thereby establishing a reasonable business expectancy. *Clinch,* 187 S.W.3d at 15.

Moreover, some of the statements challenged by Appellants were related to comments made by Washington about HCA's commitment to Dr. Topper that were made after the contract was executed and in effect. The parol evidence rule only applies to prior or contemporaneous oral agreements and does not preclude evidence of the parties' statements or behavior after the execution of the contract.

*Celtic Corp.,* 254 S.W.3d at 142. Point denied.

In their fourth point, Appellants assert that the trial court erred in refusing to submit a non-MAI instruction, in addition to the standard MAI instruction on defamation, stating that statements of opinion are not defamatory. Appellants argue that the trial court erred in refusing to give defendants' proposed Jury Instruction C which stated:

> When considering each claim of defamation, only statements of fact are actionable; statements of opinion are not defamatory under the law. If you find that any statements made by defendants represented an expression of their opinion of Dr. Topper, and were not intended to be statements of fact concerning him, you must find such statements were not defamatory.

"Rule 70.02(b) requires the use of the Missouri Approved Instructions whenever an approved instruction is applicable." *Goralnik v. United Fire & Cas. Co.,* 240 S.W.3d 203, 209 (Mo.App. E.D. 2007). "The use of an MAI instruction is mandatory where such instruction is applicable to the case." *Id.* "MAI instructions, promulgated and approved by the Supreme Court, are authoritative if applicable to the factual situation ... this court, as well as the trial court, is bound by them as surely as it is bound by Supreme Court cases and rules." *Id.* (internal quotation omitted). "To require that the trial court give a non-MAI instruction, a party has to prove that the MAI instruction submitted to the jury misstates the law." *Id.* Appellants make no assertion that the MAI defamation instructions submitted to the jury misstate the law in any way. Point denied.

Appellants' next point challenges the sufficiency of the evidence to support the submission of punitive damages to the

jury related to Dr. Topper's tortious interference claim, and their sixth point makes the same claim with respect to the submission of punitive damages on the defamation claim.

■■■ "Whether the plaintiff presented sufficient evidence to support his award of punitive damages is a question of law, which we review *de novo.*" *Horizon Mem'l Group, L.L.C. v. Bailey,* 280 S.W.3d 657, 661 (Mo.App. W.D.2009). "We review only to determine whether or not, as a matter of law, the plaintiff presented enough evidence to submit his claim of punitive damages to the jury." *Id.* "In conducting this review, we view the evidence and all reasonable inferences that can be drawn from that evidence in a light most favorable to the verdict, and we disregard all contrary evidence and inferences." *Id.*

■■ "A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Smith v. Brown & Williamson Tobacco Corp.,* 275 S.W.3d 748, 811 (Mo. App. W.D.2008) (internal quotation omitted). "It is not so much the commission of the intentional tort as the conduct or motives, i.e., the defendant's state of mind which prompted its commission, that form the basis for a punitive damage award." *Hoyt v. GE Capital Mortgage Servs. Inc.,* 193 S.W.3d 315, 323 (Mo.App. E.D.2006). "Factual inferences which convincingly and clearly support the notion that the defendant acted with evil motive or reckless indifference to the rights of others are sufficient to meet the standard for submission of punitive damages." *Johnson v. Allstate Ins. Co.,* 262 S.W.3d 655, 666 (Mo.

App. W.D.2008) (internal quotation omitted).

As noted *supra,* the evidence sufficiently supports the conclusion that Jones's statements were made without him having a legitimate, evidentiary basis for making those statements. Jones either knowingly acted to ruin the reputation of Dr. Topper or acted with reckless indifference to his rights in making those false statements. The jury could have inferred that Jones was seeking to influence Kueny to terminate Dr. Topper and to avoid ill feelings from those working for and with Dr. Topper as a result of his firing. Indeed, both Jones and Hicks testified that they were concerned that nurses and nurse practitioners might quit in response to his firing. Thus, the submission of punitive damages against Centerpoint on the defamation claim was supported. Furthermore, using those false statements to induce Midwest Newborn Care to terminate Dr. Topper provided a sufficient basis for submitting punitive damages on the tortious interference claim.

■ The evidence supporting the submission of punitive damages against Research is more attenuated. The record does, however, support a finding that Beers acted with reckless indifference toward the professional reputation of Dr. Topper when he chose to utilize his own definition of "newborn" when he should have known there was a different, well-established definition for that term in the medical community. Accordingly, the submission of punitive damages on the defamation claim against Research was supported by the evidence. In addition, while Hicks and Kueny denied that these statistics were used to convince Kueny that Midwest Newborn Care should fire Dr. Topper, the jury was not required to find that testimony credible and could have inferred that Hicks recklessly used the statistics to influence that decision.

In short, the record sufficiently supported the submission of punitive damages on both the defamation and tortious interference counts. Points denied.

■■■ In their final point, Appellants contend that the trial court erred in refusing to set aside the punitive damage awards because they may have been influenced by irrelevant evidence or improper argument. Appellants claim that evidence of the decline in the ability of the NICU to handle certain types of newborns after Dr. Topper was terminated may have resulted in Dr. Topper improperly recovering punitive damages for alleged damage to the community or other third persons.

The jury was properly instructed on punitive damages related to both claims upon which they found liability and, as noted *supra*, sufficient evidence was presented to support those awards. Appellants' speculation that certain evidence and arguments related to other claims may have caused the jury to inflate the punitive damages awards does not provide a basis for reversal of those awards. Indeed, Appellants were the first to introduce such evidence at trial when they submitted into evidence newspaper articles referencing the problems occurring after Dr. Topper's termination. Point denied.

As noted *supra*, the defamation claim submitted in the disjunctive against Research based on Fox's statement was not supported by the evidence, and the defamation judgment against Research must, therefore, be reversed and the cause remanded for further proceedings. The verdict director submitted to the jury merely asked for one lump sum for compensatory damages against both Research and Centerpoint, and the verdict returned by the jury was for a joint and several sum of

$1,000,000 in actual damages for defamation. Thus, the actual damages for defamation have been fixed at $1,000,000.[3] However, this Court has no way to discern whether the jury found Research liable on the defamation claim because of (a) Fox's statement, (b) false statistics Research disseminated, or (c) both. Similarly, we cannot determine what portion, if any, of the punitive damages awarded against Research may have been attributable to Fox's statement, as opposed to the false statistics. Accordingly, the defamation verdict against Research, including the punitive damage award against Research on the defamation count, is reversed, and the cause is remanded for further adjudication of whether Research is jointly liable for the actual damages found by the jury on the defamation claim, as well as potential punitive damages. In all other respects, the judgment is affirmed.

All concur.

---

**3.** None of the parties have challenged the manner in which the defamation claims in this case were submitted, including the submission of a single compensatory damage award against all defendants, and, therefore, we do not address the issue.