

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| DERRICK DELAROSA, Sucessor | ) | |
| Personal Representative of THE | ) | |
| ESTATE OF PHYLLIS DELAROSA and | ) | |
| DERRICK DELAROSA, Individually, | ) | |
| Respondents, | ) | WD77941 |
| v. | ) | |
| | ) | |
| FARMERS STATE BANK S/B, | ) | FILED: November 10, 2015 |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF VERNON COUNTY
### THE HONORABLE DENNIS D. REAVES, JUDGE

### BEFORE DIVISION THREE: KAREN KING MITCHELL, PRESIDING JUDGE, LISA WHITE HARDWICK AND ANTHONY REX GABBERT, JUDGES

Farmers State Bank, S/B ("Bank") appeals from a judgment awarding actual and punitive damages to Derrick DeLaRosa and the Estate of Phyllis DeLaRosa (collectively "DeLaRosa") on their conversion claim against the Bank. The Bank contends the circuit court erred in instructing the jury on the conversion claim and in submitting the claim for punitive damages. For the reasons explained herein, we find no error and affirm the judgment.

### FACTUAL AND PROCEDURAL HISTORY

Phyllis DeLaRosa died in March 1991, leaving her minor son, Derrick DeLaRosa, as her sole beneficiary. The Estate of Phyllis DeLaRosa was opened in

April 1991, with Nancy Coyner appointed as personal representative and conservator of the Estate.

In late 1995 and early 1996, Coyner wrote three checks from an Estate account, all of which were made payable to the Bank. Each check listed the account owner as "Phyllis R. DeLaRosa Estate, Nancy Coyner, Pers. Rep., C/O Nancy Coyner." The first check was written on November 13, 1995 in the amount of $20,000. Bank teller Linda Moore, at the instruction of Coyner, deposited most of the proceeds of the check into several of Coyner's personal checking or savings accounts and distributed a portion to Coyner in cash. Moore applied $2,397.80 of the proceeds as an interest payment to the Bank on a loan that Coyner owed to the Bank.

Coyner subsequently wrote a second check on December 1, 1995, in the amount of $9,000, and a third check on February 29, 1996, in the amount of $10,000. The proceeds of these checks were either deposited in Coyner's personal accounts at the Bank or paid out to Coyner in cash. Unlike the first check, none of the proceeds were used to make any payment for a debt owed the Bank.

Coyner died in April 1996, and Connie Hendren was appointed as the successor personal representative of the Estate. Hendren reviewed the financial records and concluded that the three checks described above were misappropriated from the Estate. With Hendren as the party plaintiff, the Estate filed suit against the Bank to recover the misappropriated funds in the total amount of $39,000.

During discovery in March 2006, the Estate asked the Bank to explain how the proceeds of the three checks were handled. The Bank provided an interrogatory response stating that it "Deposited [the proceeds] to [the] Phyllis DeLaRosa Estate account." The Bank did not disclose that it had actually deposited the proceeds into Coyner's personal accounts and that it received some of the funds in payment of a debt owed the Bank. Another interrogatory inquired whether Coyner had any loan accounts with the Bank during the period of 1995-1996 when the checks were drawn. The Bank responded that it "does not maintain records of loans this old."

In 2008, the circuit court granted the Bank's motion for summary judgment on the Estate's claims, and the Estate appealed to this court. *Hendren v. Farmers State Bank, S.B.*, 272 S.W.3d 345 (Mo. App. 2008). In reversing the summary judgment, we concluded that the Bank failed to present any evidence that it properly handled the proceeds of the three checks:

> Though the Bank claims that the proceeds were deposited to the [Estate] savings account, the Bank has no evidence, documentary or otherwise, to support that assertion. The records pertaining to the proceeds of the three checks are, according to the Bank, no longer available. The Bank knew as early as 1999 that there were claims of discrepancies and missing funds with regard to the DeLaRosa Estate. Yet the Bank now has no records concerning the proceeds of the three checks. All that is known is that the Bank received the $39,000 in proceeds. What happened after the Bank's receipt of the money is unknown.
>
> The Bank acknowledges that the funds were not tendered for the Bank to keep, as in payment of a debt owed the Bank. That being the case, the burden is on the Bank to protect itself from the presumption that the Bank improperly benefited from the funds.

3

*Id.* at 352. Because the Bank could not account for the funds "beyond its naked, undocumented assertion that it placed the funds on deposit," we held that there was an inference that the Bank improperly benefited from the funds. *Id.* at 352–53. We reversed the summary judgment and remanded the case to allow the Bank to present evidence to "overcome the presumption of bad faith and the presumption that the Bank still owes the funds to the [Estate]." *Id.* at 353.

In March 2009, the Bank "supplemented" the discovery responses in which it had previously denied the existence of any records related to the three checks. The Bank explained that it was unable to find the records originally, but now the records had been found after a more thorough search. The Bank provided records to show: (1) how the proceeds of the three checks were applied; (2) that Coyner in fact had loans with the Bank during 1995–1996; and (3) that the Bank received a portion of the proceeds from the first check as payment on one of Coyner's loans.

Upon reaching the age of majority in 2011, Derrick DeLaRosa was substituted as the successor personal representative of the Estate (replacing Hendren). He also was added as an individual plaintiff in the lawsuit against the Bank. The court granted DeLaRosa leave to file a First Amended Petition seeking compensatory and punitive damages for the Bank's alleged conversion of the Estate's funds in violation of the Uniform Fiduciaries Law, Section 469.270. At trial, the jury returned a verdict against the Bank on the conversion claim and awarded punitive damages. The court thereupon entered a judgment awarding DeLaRosa $104,660.31 in actual damages ($39,000 plus prejudgment interest) and $150,000 for punitive damages. The Bank appeals.

4

Whether the jury was properly instructed is a question that an appellate court reviews *de novo*. *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). "Any issue submitted to the jury in an instruction must be supported by substantial evidence from which the jury could reasonably find such issue." *Id.* (citation and internal quotations omitted). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Id.* (citation omitted). On review of a jury-tried civil case, we consider the facts in the light most favorable to the jury's verdict, and we do not determine the credibility of the witnesses, resolve conflicts in testimony, or re-weigh the evidence. *Host v. BNSF Ry. Co.*, 460 S.W.3d 87, 94 n.2 (Mo. App. 2015); *Brandt v. Csaki*, 937 S.W.2d 268, 273 (Mo. App. 1996).

**ANALYSIS**

**Conversion Claim under the UFL**

In Point I, the Bank contends the circuit court erred in overruling its objection to DeLaRosa's verdict director, which provided that the jury could find the Bank liable if it "received a financial benefit from processing payment" of the first check drawn by Coyner. The Bank argues that this instruction failed to include a required element of the conversion claim under the Uniform Fiduciaries Law (UFL). Specifically, the Bank asserts that the UFL also requires proof that the Bank had *actual knowledge* that Coyner was breaching her fiduciary duty when it accepted the benefit of the proceeds.

5

The UFL is the Missouri codification of the Uniform Fiduciaries Act (UFA), which "alters the common law with respect to the duties of parties who deal with fiduciaries." *Watson Coatings, Inc. v. Am. Exp. Travel Related Services, Inc.*, 436 F.3d 1036, 1040 (8th Cir. 2006) (citation and internal quotations omitted). The UFL's purpose is to "reliev[e] banks of their common law duty of inquiring into the propriety of each transaction conducted by a fiduciary" and to prevent "banks and others who typically deal with fiduciaries [from being] held liable for a fiduciary's breach of duty." *Id.* (citation omitted).

Section 469.270[1] of the UFL provides exceptions to the general rule that third party banks should not be held liable for a fiduciary's breach of duty:

> If a check . . . is drawn by a fiduciary as such, or in the name of his principal by a fiduciary . . . the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary *unless* he takes the instrument with *actual knowledge* of such breach or with knowledge of such facts that this action in taking the instrument amounts to *bad faith*. *If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of . . . a personal debt of the fiduciary to the actual knowledge of the creditor . . . the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument*.

(Emphasis added). The Bank interprets this statute to provide three bases for liability of a third party payee: (1) actual knowledge of the breach; (2) bad faith; or (3) "bank benefit"—in which "such instrument is payable to a personal creditor of

---

[1] This provision of the UFL was renumbered from § 456.270 to § 469.270 by the Missouri legislature on July 9, 2004. H.B. 1551, 92d Gen. Assem., Second Reg. Sess. (Mo. 2004).

the fiduciary and delivered to the creditor in payment of . . . a personal debt of the fiduciary to the actual knowledge of the creditor."

Under the third basis of liability, the Bank argues that because the statute requires a payment toward the fiduciary's personal debt to the Bank's "actual knowledge," the Bank must not only benefit from the transaction, but must also have actual knowledge that the fiduciary is breaching his fiduciary duty in making such payment. However, this interpretation of the statute conflates bases (1) and (3), as set out above. The first basis imposes liability on the Bank if it had actual knowledge that the fiduciary was breaching its fiduciary duty. If the third basis for liability also required the Bank to have actual knowledge of the breach, the statute becomes redundant. The third basis for liability would be superfluous, as the first basis would necessarily encompass the situation described under the third basis. Any interpretation rendering statutory language superfluous is not favored. *See Dubinsky v. St. Louis Blues Hockey Club*, 229 S.W.3d 126, 130 (Mo. App. 2007).

Another interpretation of the statute is that it creates only two bases of liability—actual knowledge or bad faith—and the second sentence which imposes liability in the bank benefit scenario is an *illustration* of actual knowledge or bad faith. *See Trenton Trust Co. v. W. Sur. Co.*, 599 S.W.2d 481, 493 (Mo. banc 1980) (the fact that the bank benefited "is a factor to be considered in determining whether [it] acted in bad faith under the [UFL]."). This approach to the UFA-based provision was taken in *Maryland Cas. Co. v. Bank of Charlotte*, 340 F.2d 550 (4th

Cir. 1965), which is directly on point and has been cited favorably by our courts.[2]

There, the court noted that the UFA adopted the common law presumption that in bank benefit cases "liability was imposed because [the bank] acted with knowledge of facts that were presumed to constitute a misappropriation." *Id.* at 553 n.3. In other words, the UFA explicitly made the bank benefit scenario a basis of liability "without stopping to categorize it as 'actual knowledge' or 'bad faith.' " *Id.* at 554. The court concluded that the UFA thus implied that such conduct *constitutes* either actual knowledge or bad faith. *Id.*

Under either approach, Section 469.270 requires only that the Bank had actual knowledge that it was applying the proceeds to a debt owed the Bank, and not actual knowledge that the fiduciary was breaching a duty. *See Watson Coatings, Inc.*, 436 F.3d at 1043 (holding that defendant bank could not have violated Section 469.270 "because it did not have actual knowledge *that the checks were in payment of a personal debt* of [the fiduciary].") (Emphasis added). Because the Bank was the payee on the instrument drawn by Coyner, and knowingly accepted a portion of the proceeds as payment for the personal debt of Coyner to the Bank, the Bank is liable under Section 469.270 for failing to inquire as to the propriety of the transaction. *See Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles*, 505 S.W.2d 454, 457 (Mo. App. 1974) (stating that "[t]he bank's failure to inquire . . . will render itself liable only if the bank itself benefits

---

[2] *See S. Agency Co. v. Hampton Bank of St. Louis*, 452 S.W.2d 100 (Mo. 1970); *Gen. Ins. Co. of Am. v. Commerce Bank of St. Charles*, 505 S.W.2d 454 (Mo. App. 1974).

financially from the transaction."). Thus, the court did not err in overruling the Bank's objection to DeLaRosa's verdict director.

The Bank also argues that it can only be held liable for the amount that it actually accepted in satisfaction of Coyner's debt — $2,397.80. Thus, the Bank contends the court erred in allowing the jury to find the Bank liable for the entire $39,000. The Bank cites no authority for this proposition and ignores caselaw to the contrary.

In *Maryland Cas. Co.*, the defendant bank was found liable for *all* check proceeds that were misappropriated subsequent to the bank's acceptance of funds in satisfaction of a debt owed by the fiduciary. 340 F.3d at 553. The court reasoned that upon receiving the benefit of debt repayment, the bank gained knowledge that provided sufficient notice of the fiduciary's breach and could not thereafter "divest itself of its continuing knowledge." *Id.* Thus, the bank was liable "for all later checks in the series, whether the amounts were credited to [the fiduciary]'s account or paid into her hand." *Id.* Likewise here, once the Bank accepted debt payments from the proceeds of Coyner's first check, it had sufficient notice and knowledge of Coyner's breach of duty on the second and third check transactions. The circuit court did not err in finding the Bank liable for the full amount of the misappropriated funds on all three checks.

Point I is denied.

**Punitive Damages**

In Point II, the Bank contends the trial court erred in submitting the punitive damages instruction because DeLaRosa failed to present clear and convincing

9

evidence of intentional acts that would amount to an evil motive or a reckless disregard for DeLaRosa's rights. "Whether there is sufficient evidence for an award of punitive damages is a question of law." *Perkins v. Dean Mach. Co.*, 132 S.W.3d 295, 299 (Mo. App. 2004). We review the record in the light "most favorable to submissibility to determine whether, as a matter of law, the evidence was sufficient to submit the claim for punitive damages." *City of Greenwood v. Martin Marietta Materials, Inc.*, 299 S.W.3d 606, 627 (Mo. App. 2009). "A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity . . . that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Perkins*, 132 S.W.3d at 299 (citation and internal quotations omitted).

In the context of intentional torts, courts generally consider punitive damages based on the state of mind that prompted the commission of the tort or existed contemporaneously therewith. *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 132 (Mo. App. 2010). In other words, the defendant must have acted with an evil motive or reckless indifference to the rights of others when it engaged in the conduct that caused the underlying injury. *See Collins v. Trammell*, 911 S.W.2d 635, 639 (Mo. App. 1995).

At trial, DeLaRosa argued for punitive damages based on the Bank's efforts to "cover up" records of check transactions in response to discovery requests. Because the discovery responses were not provided until many years after the actual conversion of funds, the Bank argues that there was not a sufficient "nexus"

10

to prove that it acted with an evil motive or reckless indifference when the tortious conduct occurred. The Bank also asserts that discovery responses cannot provide the basis for a punitive damages award, and that DeLaRosa was only entitled to request sanctions for any misconduct during discovery.

As DeLaRosa points out, the Bank's argument "misses the point" by focusing on *when* the conduct occurred, rather than the *nature* of the conduct itself. Notwithstanding the passage of time, the Bank's conduct in concealing the records of the proceeds bears a direct relationship to the conversion of those proceeds. That the Bank may have been successful in shielding evidence which showed that it had benefited from the misappropriation for such a long time does not somehow render the subsequent conduct unrelated.

Our courts have routinely upheld punitive damages awards based on cover-up activities that occurred after the conduct causing the underlying harm. Most recently, in *Ellison v. O'Reilly Auto. Stores, Inc.*, 463 S.W.3d 426, 436 (Mo. App. 2015), we affirmed punitive damages based, in part, on an employer's after-the-fact attempt to conceal its unlawful discrimination against a disabled employee. *See also Kaplan v. U.S. Bank, N.A.*, 166 S.W.3d 60, 73–74 (Mo. App. 2003) (recognizing that the jury could consider the timeliness and sincerity of the defendant's offer to correct the initial harm in determining whether there was a complete indifference to the plaintiff's rights); *Budget Rent-A-Car of Missouri, Inc. v. B&G Rent-A-Car, Inc.*, 619 S.W.2d 832, 837–38 (Mo. App. 1981) (upholding punitive damages for breach of noncompetition agreement when the evidence showed breach to have been willful and the breach "was sought to be

11

concealed."). Misconduct during discovery supported the punitive damages award in *Haynes v. Hawkeye Sec. Ins. Co.*, 579 S.W.2d 693 (Mo. App. 1979), where the defendant falsely responded to interrogatories in an effort to conceal a conspiratorial agreement.

DeLaRosa presented sufficient evidence to support the punitive damages claim based on the Bank's effort to conceal records and information about the conversion of funds from the Estate. The Bank initially responded to discovery requests by stating that it deposited the proceeds of the subject checks into the account for the Estate. The Bank also responded that it had no records regarding the check transactions. After this Court reversed the grant of summary judgment based on the Bank's failure to produce evidence regarding the check transactions and account information, the Bank conducted a further search and "found" records that showed the initial discovery responses were false. The Bank had no "legitimate, evidentiary basis" for its initial discovery response and, therefore, the jury could have concluded that the Bank either knowingly provided a false statement or acted with reckless indifference to DeLaRosa's rights. *See Topper*, 306 S.W.3d at 132. The jury likely disbelieved the Bank's explanation that the "discrepancy" in discovery responses was the result of an innocent mistake. Viewing the conflicting evidence and the inferences to be drawn therefrom in the light most favorable to DeLaRosa, a reasonable juror could have concluded that the Bank intentionally misrepresented that it did not have the records in an effort to conceal the conversion.

Finally, the Bank argues that imposing punitive damages upon a defendant when its discovery responses have changed would be "poor precedent." The Bank points out that Rule 56.01(e) requires parties to supplement discovery responses, and that the Bank should not be punished for complying with this rule. Rule 56.01(e), however, imposes a duty on a party to supplement its responses when it "learns" that its initial response was incomplete or incorrect. In the case where a party has intentionally provided false information in the first instance, as the jury could have inferred here, that party has not "learned" that the response was incorrect. The Bank's argument improperly assumes that its innocent explanation for the discrepancy in discovery responses was credible and, therefore, is rejected.

Point II is denied.

### CONCLUSION

We affirm the circuit court's judgment.

_____
LISA WHITE HARDWICK, JUDGE

ALL CONCUR.